**David Weitman, Esq.**
**Texas State Bar No. 21116200**
**Daniel I. Morenoff, Esq.**
**Texas State Bar No. 24032760**
**K&L GATES LLP**
**1717 Main Street, Suite 2800**
**Dallas, Texas  75201**
**Telephone (214) 939-5500**
**Telecopy:  (214) 939-6100**

**ATTORNEYS FOR WELLS FARGO CAPITAL FINANCE, INC.**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 11-30210-BJH-11 |
| | § | |
| FRE REAL ESTATE, INC., | § | |
| f/k/a TCI PARK WEST II, INC., | § | CHAPTER 11 |
| | § | |
| Debtor. | § | |

### MOTION TO DISMISS FRE REAL ESTATE, INC.'S CHAPTER 11 PETITION PURSUANT TO 11 U.S.C. §1112(b) DUE TO ITS BAD FAITH FILING OR, IN THE ALTERNATIVE, TO CONVERT THE CASE TO A CHAPTER 7 CASE[1]

**NO HEARING WILL BE CONDUCTED HEREON UNLESS A WRITTEN OBJECTION IS FILED WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT BEFORE CLOSE OF BUSINESS ON JANUARY 31, 2011, WHICH IS TWENTY-ONE (21) DAYS FROM THE DATE OF SERVICE HEREOF.**

**ANY RESPONSE MUST BE IN WRITING AND FILED WITH THE CLERK, AND A COPY MUST BE SERVED UPON COUNSEL FOR THE MOVING PARTY PRIOR TO THE DATE AND TIME SET FORTH HEREIN.  IF A RESPONSE IS FILED A HEARING WILL BE HELD WITH NOTICE ONLY TO THE OBJECTING PARTY.**

**IF NO HEARING ON SUCH NOTICE OR MOTION IS TIMELY REQUESTED, THE RELIEF REQUESTED SHALL BE DEEMED TO BE UNOPPOSED, AND THE COURT MAY ENTER AN ORDER GRANTING THE RELIEF SOUGHT OR THE NOTICED ACTION MAY BE TAKEN.**

---

[1]   Contemporaneously with the filing of this Motion, Wells Fargo Capital Finance, Inc. will be filing a Motion to Expedite.

**MOTION TO DISMISS OR CONVERT** - Page 1
DA-3157639 v4 1279056-00115

**TO THE HONORABLE BARBARA J. HOUSER,
UNITED STATES BANKRUPTCY JUDGE:**

Wells Fargo Capital Finance, Inc. ("Wells Fargo"), a major secured creditor in the above-referenced case, moves for an order, pursuant to Section 1112(b) of title 11 of the United States Code §§101, et seq., as amended (the "Bankruptcy Code"), dismissing FRE Real Estate, Inc.'s Chapter 11 petition (the "Petition") on the grounds that the Petition was filed in bad faith or, in the alternative, to convert the case to a Chapter 7 case (this "Motion"). In support of this Motion, Wells Fargo alleges the following:

### I.    JURISDICTION

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2).

### II.    BACKGROUND

2. On January 4, 2011 (the "Petition Date"), the Debtor filed its Petition under Chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtor has remained in possession of its property and operated its affairs as a debtor-in-possession under 11 U.S.C. §§ 1107 and 1108.

3. Prior to the Debtor's filing the Petition seeking relief from its creditors, the following actions were taken by the Debtor and its affiliates:

> a. Within the two (2) week period preceding the filing of the Petition by the Debtor, TCI Texas Properties, LLC ("TCI"), an affiliate of the Debtor, transferred to the Debtor ten (10) properties constituting the first lien collateral of Wells Fargo and securing the repayment of approximately $8.2 million of indebtedness owing to Wells Fargo;

> b. Upon information and belief, within the two (2) week period preceding the filing of the Petition by the Debtor, Income Opportunity Realty Investors, Inc., an affiliate of the Debtor, transferred to the Debtor certain properties, constituting the first lien collateral of NexBank (whose special servicer is Highland Capital Management) and securing the repayment of approximately $65 million of indebtedness owing to NexBank;

  c. Upon information and belief, within the two (2) week period preceding the filing of the Petition by the Debtor, Transcontinental Investors, Inc., an affiliate of the Debtor, transferred to the Debtor certain property; and

  d. Upon information and belief, within the two (2) week period preceding the filing of the Petition by the Debtor, three (3) affiliates of the Debtor transferred to the Debtor certain properties, constituting the first lien collateral of RMR Investments, Inc. and securing the repayment of approximately $7.5 million of indebtedness owing to RMR Investments, Inc.

4. Such filing was designed by the Debtor to impede Wells Fargo's ability to exercise its rights and remedies against TCI -- and to wrongfully manipulate the bankruptcy system by frustrating the rights and remedies of numerous other secured creditors with other collateral transferred on the eve of bankruptcy by their respective borrowers into the Debtor.

5. By this Motion, Wells Fargo asks that this Court find that the wrongful transfers to the Debtor (in the weeks prior to the Debtor's filing its Petition) of TCI's property, constituting Wells Fargo's collateral, constitutes "cause" for the dismissal of the Debtor's case, or alternatively, that there is "cause" to convert the Debtor's case to a case under Chapter 7.

### III. WELLS FARGO INDEBTEDNESS AND THE LIENS GRANTED TO WELLS FARGO

6. As of the Petition Date, TCI, an affiliate of the Debtor, owed Wells Fargo the approximate sum of $8.2 million (the "<u>Wells Fargo Indebtedness</u>"), secured by ten (10) properties, all unimproved real estate located in Farmers Branch, Texas, Kaufman and Dallas Counties, and Valley Ranch (Irving, Texas) (collectively, the "<u>Real Estate Collateral</u>").

7. Wells Fargo, as indicated below, has been working with TCI, its borrower, since March, 2007 to work through the various defaults under the loan documents between Wells Fargo and TCI.

8. On the morning of Tuesday, January 4, 2011, Wells Fargo first learned that TCI had transferred Wells Fargo's collateral to the Debtor and the Debtor had filed for relief from

its creditors under Chapter 11. At the time, Wells Fargo had not posted its properties constituting its collateral for foreclosure for the first Tuesday of January, 2011. In fact, Wells Fargo was still in talks with the Debtor to work through issues, continue with a consensual marketing plan for the properties, with a broker, and agreed release and sale prices – consistent with the realities of 2011. Again, Wells Fargo was trying to work with its borrower, and the Debtor and TCI engineered the transfer of Wells Fargo's collateral – so that there would be one (1) "mega-debtor" with a roll-up of all of the collateral from various lenders[2], including Wells Fargo.

9. Wells Fargo never consented to the transfer of TCI's properties into the Debtor, and in fact, the operative loan documents – in numerous places – prohibit the very actions taken by TCI.

10. As a matter of background, on November 1, 2006, Wells Fargo, as lender, and TCI, as borrower, entered into that certain Credit Agreement, dated as of November 1, 2006 (as amended from time to time, the "Credit Agreement"), as amended by (i) that certain First Amendment to Credit Agreement, dated March 28, 2007 (the "First Amendment"), and (ii) that certain Second Amendment to Credit Agreement, dated August 6, 2008 (the "Second Amendment").

11. As of the Petition Date, TCI had defaulted under the terms of the Credit Agreement including, without limitation, failing to make payments as required under the Credit Agreement. Wells Fargo agreed to temporarily forbear from exercising certain of Wells Fargo's rights and remedies under the Credit Agreement, the Guaranty (as defined below) and the other Loan Documents (as defined in the Credit Agreement) on the terms and conditions set forth

---

[2] Upon information and belief, several secured creditors had posted various properties of their respective borrowers, affiliates of the Debtor, for foreclosure for the first Tuesday in January 2011, and those lenders never consented to the transfers to the Debtor by their respective borrowers of their respective collateral.

in that certain Forbearance Agreement dated April 21, 2009 (the "First Forbearance Agreement"), by and among TCI, Wells Fargo and Transcontinental Realty Investors, Inc. (the "Guarantor"), guarantor of the obligations under the Credit Agreement pursuant to that certain General Continuing Guaranty, dated as of November 1, 2006 (as the same has been reaffirmed from time to time, the "Guaranty").

12. The agreement of Wells Fargo to forbear from exercising certain of its rights and remedies under the Credit Agreement, the Guaranty, and the other Loan Documents under the First Forbearance Agreement expired on June 30, 2009, and the conditions precedent for any extension of such period were neither satisfied nor waived.

13. Wells Fargo again agreed to temporarily forbear from exercising certain of Wells Fargo's rights and remedies under the Credit Agreement, the Guaranty and the other Loan Documents on the terms and conditions set forth in that certain Amended and Restated Forbearance Agreement and Third Amendment to Credit Agreement, dated as of April 21, 2010 (the "Second Forbearance Agreement"; together with the First Forbearance Agreement, the "Forbearance Agreements"), by and among Wells Fargo, TCI, and the Guarantor.

14. The agreement of Wells Fargo to forbear from exercising certain of its rights and remedies under the Credit Agreement, the Guaranty, and the other Loan Documents pursuant to the Second Forbearance Agreement expired on September 30, 2010, and the conditions precedent for any extension of such period were neither satisfied nor waived.

15. The Debtor's assets consist of real property transferred by TCI (and other affiliates of the Debtor) to the Debtor on the eve of the Debtor's bankruptcy filing, including the Real Estate Collateral previously owned by TCI and subject to the first-priority liens in

favor of Wells Fargo. Such transfers of the Real Estate Collateral were in violation of the terms of the Credit Agreement.[3]

16. As of the date of the filing of this Motion, Wells Fargo believes that the Real Estate Collateral is marginally greater in value than the Wells Fargo Indebtedness.[4]

17. Wells Fargo is aware of no operations of the Debtor, no unencumbered cash-flow available to the Debtor to maintain, protect, and insure the Real Estate Collateral, and no other unencumbered assets of the Debtor. In fact, it is Wells Fargo's understanding that all of the Debtor's operations are handled by affiliates. (It is significant that as of the date of the filing of this Motion, the Debtor has not even filed a motion to use cash collateral nor circulated a proposed budget to address the cash needs of any of its properties, including the Real Estate Collateral, recently and wrongfully transferred by TCI to the Debtor.)

---

[3] TCI violated Section 6.3 of the Credit Agreement, which provides that **TCI may not** – "**[o]ther than in accordance with Section 7.4 below, convey, sell, lease, license, assign, transfer, or otherwise dispose of (or enter into an agreement to convey, sell, lease, license, assign, transfer, or otherwise dispose of) any Mortgaged Property**." (emphasis added)

TCI violated Section 6.8 of the Credit Agreement, which provides that **TCI may not –"[d]irectly or indirectly enter into or permit to exist any transaction with any Affiliate of any Borrower [TCI] except for transactions between any Borrower [TCI], on the one hand, and any Affiliate of such Borrower [TCI] (including any other Borrower), on the other hand, so long as such transactions (i) are upon fair and reasonable terms,** (ii) are fully disclosed to Agent if they involve one or more payments by a Borrower in excess of $25,000.00 for any single transaction or series of transactions, and (iii) **are no less favorable to such Borrower than would be obtained in an arm's length transaction with a Person that was not an Affiliate of such Borrower**." [emphasis added]

TCI violated Section 7.2 of the Credit Agreement, which provides that "**no Borrower will nor will any Borrower permit any of its Subsidiaries to… Make, suffer or permit, without the prior written consent of the Agent, any sale, assignment, transfer, lease, or other encumbrance of any Mortgaged Property except in accordance with Section 7.4 below.**" [emphasis added]

TCI violated Section 7.4 of the Credit Agreement, which provides that TCI may, "**[n]otwithstanding anything to the contrary contained herein, … sell, assign, transfer, or otherwise convey any Pledge Property so long as, upon consummation of such transaction, Borrowers comply with the prepayment obligations set forth in Section 2.3(c) above.**" [emphasis added] TCI has failed to pre-pay its obligations owing to Wells Fargo, consistent with Section 2.3(c) of the Credit Agreement.

[4] Wells Fargo reserves the right to obtain an appraisal for the Real Estate Collateral at a later date. As of the filing of this Motion, all evidence available to the Wells Fargo suggests that it is marginally oversecured by its liens against the Real Estate Collateral recently transferred to the Debtor. Further, TCI has had several years to refinance the Wells Fargo Indebtedness, and it has been unsuccessful, strongly suggesting that TCI (and now the Debtor) may have only minimal equity in such property.

**MOTION TO DISMISS OR CONVERT** - Page 6
DA-3157639 v4 1279056-00115

18. Inasmuch as the Debtor has filed no Schedules of Assets and Liabilities nor any pleading with the Court shedding light on how it intends to operate and meet its fiduciary obligations, Wells Fargo believes that the Debtor may have no source of payment to satisfy 2010 ad valorem real property taxes on the Debtor's assets (including the Real Estate Collateral wrongfully transferred).

19. In light of the timing of the filing and the actions of TCI to transfer the Real Estate Collateral to the Debtor in violation of the terms of the Credit Agreement (and the numerous other wrongful transfers by the Debtor's affiliates to the Debtor to stay foreclosure proceedings), this Court must find that (i) the case was filed in bad faith[5], (ii) the Debtor has no realistic ability to confirm a plan of reorganization since it has no unencumbered assets of the estate with which the Debtor could hope to adequately protect Wells Fargo's interest in the Debtor's assets; and (iii) the Debtor has engaged in gross misconduct.

20. This Court should not permit the Debtor and its affiliates to engage in fraudulent conveyances on the eve of a bankruptcy filing – to manipulate the system, generate numerous conflicts of interest between the Debtor and its affiliates (not to mention the Debtor's professionals), and thereby effect a complete roll-up of troubled properties in a bad faith filing, evidencing gross mismanagement of the Debtor. If this Court were to permit the Debtor to continue in Chapter 11 proceedings – and either not dismiss the case or not convert the case to a Chapter 7 case – this Court would be sending a very clear message that such gross misconduct and wrongful manipulation of the system is permitted.

---

[5] Wells Fargo recognizes that TCI, its borrower, could have filed its own Chapter 11 bankruptcy petition to seek relief from its respective creditors, including Wells Fargo, had it not chosen instead to engage in wrongful transfers of the Real Estate Collateral to the Debtor. The Debtor's case should be dismissed for bad faith filing, and the Real Estate Collateral should be ordered re-transferred to TCI, though Wells Fargo recognizes that TCI could then file its own voluntary petition in bankruptcy under Chapter 11 of the Bankruptcy Code, whereupon Wells Fargo would take such other actions as may be necessary before the Bankruptcy Court in the newly filed case.

**MOTION TO DISMISS OR CONVERT** - Page 7
DA-3157639 v4 1279056-00115

21. This Court should not permit such activity.

22. Accordingly, Wells Fargo is deeply concerned by the direction of this case and by the transfers of the Real Estate Collateral from TCI to the Debtor (and the numerous other transfers to the Debtor of other secured parties' respective collateral from their respective borrowers on the eve bankruptcy) in violation of the terms of the Credit Agreement (and presumably in violation of the other secured lenders' respective loan documents), and asks that this Court dismiss this Chapter 11 case since it is a "bad faith" filing.

## IV.　RELIEF REQUESTED

23. Through this Motion, Wells Fargo seeks an order from the Court dismissing the Debtor's Chapter 11 petition pursuant to Section 1112(b) of the Bankruptcy Code due to its bad faith filing or, in the alternative, converting the case to a Chapter 7 case.

24. Section 1112(b) provides that "on request of a party in interest ... , and after notice and a hearing, the Court may .... dismiss a case under this chapter ... for cause ... ". Section 1112(b) then goes on to set forth a list of circumstances which constitute cause. Such circumstances include, among others, the inability to effectuate a plan.

25. The list in Section 1112(b), however, is illustrative and not exhaustive. *See, e.g., In re Mirant Corp.*, 2005 WL 2148362, *5 (Bankr. N.D. Tex. 2005).

26. Inherent in the statute and clearly inferred from Section 1112(b) is the requirement of good faith on the part of the debtor to file and maintain a Chapter 11 case. This good faith Chapter 11 prerequisite has been consistently upheld by the Courts. *Mirant*, 2005 WL 2148362 at *5 (citing *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072 (5th Cir. 1986)).

27. "Numerous cases have found a lack of good faith to constitute 'cause' for lifting the stay to permit foreclosure or for dismissing the case." *Little Creek*, 779 F.2d at 1072.

28. The initial burden of proof for dismissal of Chapter 11 petition on grounds of a bad faith filing lies with the moving party. However, once the debtor's good faith has been put into question, the debtor bears the burden of proving good faith. *See, e.g., In re SGL Carbon Corp.*, 200 F.3d 154 (3rd Cir. 1999); *In re Integrated Telecom Express*, 384 F.3d 108 (3rd Cir. 1004).

29. Courts often consider the Fifth Circuit's *Little Creek* factors, include whether: (1) debtor has one asset, such as a tract of undeveloped or developed real property, (2) **secured creditors' liens encumber this tract,** (3) **there are no employees except for principals, little or no cash flow, and no available sources of income to sustain a plan of reorganization or to make adequate protection payments**, (4) there are few, if any, unsecured creditors whose claims are relatively small, (5) the property has been posted for foreclosure because of arrearages on debt, and the debtor has been unsuccessful in defending actions against foreclosure in state court or, alternatively, the debtor and one creditor may have proceeded to standstill in state court litigation, (6) **bankruptcy offers the only possibility of forestalling loss of property**, (7) **there are allegations of wrongdoing by debtor or its principals**, and (8) there is "new debtor syndrome" in which a one-asset entity has been created **or revitalized on eve of foreclosure to isolate insolvent property and its creditors**. *In re Bergeron*, 218 B.R. 1003 (Bankr. E.D. La. 1998) (citing *Little Creek*, 779 F.2d 1068) (emphasis added).

30. Other courts have found cause to dismiss a debtor's bankruptcy case when "[t]he predominant purpose in filing the petition was to prevent foreclosure upon the heavily encumbered property [when] there was no plan contemplated for the infusion of capital, no gain in managerial expertise, no history of past business conduct, no employees and indeed, no

current business activity on the date of the commencement of the case nor are there any reasonable prospects for the conduct of future business." *Little Creek*, 779 F.2d at 1073 (*quoting In re Thirteenth Place, Inc.*, 30 B.R. 503 (Bankr. App. 9th Cir. 1983).

31. As noted, a critical circumstance found by courts to be illustrative of a bad faith filing is referred to as "new debtor syndrome." *Little Creek*, 779 F.2d at 1073. *See, e.g., Eclair Bakery* 255 B.R. 121, 140 (Bankr. S.D.N.Y. 2000); *In re Yukon Enterprises, Inc.*, 39 B.R. 919, 921 (C.D.Cal. 1984); *In re 234 West 22nd St. Corp.*, 214 B.R. 751 (Bankr. S.D.N.Y. 1997); *In re HBA East, Inc.*, 87 B.R. 248, 258 (Bankr. E.D.N.Y. 1988).

32. "The 'new debtor syndrome,' in which a one-asset entity has been created or **revitalized** on the eve of foreclosure to isolate the insolvent property and its creditors, exemplifies, although it does not uniquely categorize, bad faith cases." *Little Creek*, 779 F.2d at 1073.

33. Other characteristics of new debtor syndrome include the fact that "[t]he new entity usually has few if any unsecured debts, no employees other than the controlling participants, no means of servicing the debt other than through the transferred property, no cash flow, and no ongoing business prospects." *In re Adbrite Corporation*, 290 B.R. 209, 218 (Bankr. S.D.N.Y. 2003).

34. "Once [a] creditor establishes that the transfer of the distressed property to the debtor was in close proximity to the filing of the case, a prima facie showing of bad faith has been shown, thus creating a rebuttable presumption of bad faith. The burden, thereafter, is on the debtor to establish good and sufficient reasons why the relief should not be granted." *In re Eclair Bakery Ltd.*, 255 B.R. at 140 (discussing new debtor syndrome in the context of the

automatic stay). *But, see, In re 234-6 West 22nd St. Corp.*, 214 B.R. 751 (Bankr. S.D.N.Y. 1997) (applying the same standard in the context of a Section 1112 (b) dismissal).

35. The Petition submitted by the Debtor demonstrates a classic example of new debtor syndrome. The Real Estate Collateral and other distressed real property collateral was transferred to the Debtor on the eve of the bankruptcy filing in order to isolate the assets and forestall Wells Fargo and other secured creditors from exercising their rights and remedies against their respective collateral.

36. Moreover, the Debtor's case has several of the other attributes of new debtor syndrome. Upon information and belief, the Debtor's unsecured debts are minimal compared to its secured debts. It appears the Debtor has no employees, and the Debtor conducts all of its business through retaining the services of its affiliates. The Debtor has no means of servicing the debt other than through the transferred property and the Debtor's attempts to try to use the encumbered cash and rents constituting other lenders' collateral to try to pay the costs in connection with the maintenance, security, insurance, and protection of the Real Estate Collateral (formerly owned by the Debtor's affiliate).

37. In addition, the Debtor exhibits each of the *Little Creek* factors indicative of bad faith: (1) the Debtor's only assets, by design, are the distressed assets transferred to the Debtor on the eve of the Debtor's bankruptcy filing; (2) Wells Fargo's and other similarly situated secured creditors' liens encumber the Debtor's assets, including the Real Estate Collateral; (3) upon information and belief, there are no employees of the Debtor except for its officers, little or no cash flow, and no available unencumbered sources of income to sustain plan of reorganization or to make adequate protection payments; (4) upon information and belief, the Debtor's unsecured debts are minimal compared to its secured debts; (5) TCI has been in

default under the Credit Agreement for an extended period of time, and, but for the Debtor's bankruptcy filing, Wells Fargo would have the presently exercisable right to foreclose on the Real Estate Collateral; (6) TCI was unsuccessful in its attempts to sell or refinance the Real Estate Collateral, leaving bankruptcy protection, at some point down the road, as TCI's strategy to forestall Wells Fargo's collection efforts; (7) the actions of the principals of the Debtor and TCI to transfer the Real Estate Collateral were in violation of the terms of the Credit Agreement, were fraudulent, and constitute gross mismanagement; and (8) as stated previously, the factors evidencing "new debtor syndrome" are present.

38. Further, by creating a pool of assets previously held by other entities, the Debtor is strategically seeking to (i) frustrate the creditors of the Debtor and its affiliates, (ii) artificially and improperly gerrymander classes of creditors (presumably, in contemplation of a plan of reorganization), (iii) conceal, with impunity, numerous fraudulent conveyances, breaches of fiduciary duty by the Debtor and its affiliates, and conflicts of interests between the Debtor and its affiliates, and (iv) wrongfully manipulate the bankruptcy system – given the fact that the Debtor (and its affiliates, including TCI) could not have done such roll-up (and improper transfers) of properties under their respective loan documents – and would have been required to have filed separate petitions in bankruptcy, with separate lists of unsecured creditors, executory contracts, schedules of assets and liabilities, and statements of financial affairs, for each entity. In this way, each entity would be judged under the standards of the Bankruptcy Code.

39. Upon information and belief, each of the Debtor's affiliates was a special purpose entity – with a single secured creditor. Certainly, in the case of TCI, Wells Fargo was the single secured creditor of TCI. Through the wrongful transfers by TCI to the Debtor of the

Real Estate Collateral – the Debtor has taken what would have otherwise been a "two-party dispute" and converted these proceedings involving TCI and the Real Estate Collateral – into a multi-lender, multi-collateral dispute. This is wrongful and should not be permitted by the Court.

40. If TCI seeks the protection of the Bankruptcy Code and obtain the benefits of the automatic stay, it should play by the rules and satisfy the requirements under the Bankruptcy Code to avoid dismissal, lift stay, conversion, or a similar fate. The Debtor, working with its affiliate, TCI, has engineered its bankruptcy filing to manipulate the system and make a mockery of the requirements under the Bankruptcy Code.

41. Finally, the Debtor's bad faith filing precludes the application of the Section 1112(b)(2) exception to mandatory dismissal or conversion. "**If cause for conversion or dismissal exists because the debtor filed its chapter 11 case in bad faith, then section 1112(b)(2) *would not apply* because, by determining that the debtor filed the case in bad faith, the court would foreclose a reasonable justification for the filing. In addition, a bad faith determination would likely constitute 'unusual circumstances' demonstrating that section 1112(b)(2) should not be applied**." 7 COLLIER ON BANKRUPTCY, P 1112.04 [3] (emphasis added).

42. Given the facts of this case, this Court should find that the Debtor filed this case in bad faith and that the case should be dismissed promptly.

43. Alternatively, pursuant to 11 U.S.C. § 1112(b), this Court can convert the case under Chapter 7 of the Bankruptcy Code if it is in the best interests of creditors and the estate, for "cause", including "gross mismanagement of the estate".

44. Clearly, given the fact that the Debtor and its affiliates have orchestrated fraudulent conveyances from the Debtor's affiliates to the Debtor, such actions constitute gross mismanagement of the estate. Further, absent the conversion of the case to a Chapter 7 case, the Debtor's officers, directors, managers, and principals – presumably all of whom are the officers, directors, managers, and principals of the affiliates – have breached their fiduciary duties to their respective entity's creditors and have incurable conflicts of interest. Any professionals retained by such officers, directors, managers, and principals of the affiliates – would likewise be tainted with conflicts of interests, in their efforts to restore the respective entity's assets – prior to such wrongful transfers. Only a newly appointed Chapter 7 trustee would be able to pursue such causes of action and undo the wrongful "roll-up" of the assets of the Debtor and its affiliates.

45. For all of these reasons, Wells Fargo asks this Court convert this case to a Chapter 7 case, if the Court is not inclined to dismiss the case due to bad faith filing.

## V. CONCLUSION AND PRAYER

**WHEREFORE**, Wells Fargo asks the Court to enter an order:

(1) dismissing the Debtor's Chapter 11 Petition due to its bad faith filing or, in the alternative;

(2) converting the Debtor's case to a case under Chapter 7; and

(3) granting Wells Fargo such other and further relief as is just and proper.

**DATED:** January 10, 2011

Respectfully submitted,

**K&L GATES LLP**

By: */s/ David Weitman*
David Weitman, Esq.
State Bar No. 21116200
Daniel I. Morenoff, Esq.
State Bar No. 24032760
1717 Main Street, Suite 2800
Dallas, Texas 75201
Telephone: (214) 939-5500
Facsimile: (214) 939-6100

**ATTORNEYS FOR WELLS FARGO CAPITAL FINANCE, INC.**

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that, on January 10, 2011, prior to the filing of this Motion, counsel to Wells Fargo Capital Finance, Inc. spoke to Debtor's counsel and explained the nature of the relief sought by his client in this Motion. Counsel for the Debtor would not consent to the relief sought herein. Further, given the fact that other secured lenders are affected by the actions taken by the Debtor in receiving fraudulent transfers prior to the filing of the proceedings by the Debtor, it is likely that this matter will be litigated – and no resolution short of litigation will occur.

*/s/ David Weitman*
David Weitman

## CERTIFICATE OF SERVICE

The undersigned certifies that on January 10, 2011, a true and correct copy of the above and foregoing was served through the Court's ECF system on those parties consenting to such service, including the Debtor. It should be noted that as of the filing of this Motion, the Debtor had not yet filed a list of its 20 largest unsecured creditors.

By: */s/ David Weitman*
David Weitman