Andrew E. Jillson
Texas State Bar No. 10666370
Cameron W. Kinvig
Texas State Bar No. 24055780
Hunton & Williams LLP
1445 Ross Avenue, Suite 3700
Dallas, Texas 75202
Telephone:  214-979-3000
Telecopy:  214-979-3963

ATTORNEYS FOR AMERICAN BANK OF COMMERCE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| FRE REAL ESTATE, INC. | § | CASE NO. 11-30210-bjh-11 |
| f/k/a TCI PARK WEST II, INC. | § | |
| | § | CHAPTER 11 |
| DEBTOR. | § | |

**MOTION OF AMERICAN BANK OF COMMERCE SEEKING
TO ANNUL OR, ALTERNATIVELY, SEEKING RELIEF
FROM, THE AUTOMATIC STAY UNDER 11 U.S.C. § 362**

**NO HEARING WILL BE CONDUCTED HEREON UNLESS A WRITTEN RESPONSE IS FILED WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION, AT 1100 COMMERCE STREET, ROOM 1254, DALLAS, TEXAS 75242-1496 BEFORE 4:00 O'CLOCK P.M. WITHIN FIFTEEN (15) DAYS FROM THE SERVICE OF THIS MOTION.**

**YOUR RESPONSE SHALL INCLUDE A DETAILED AND COMPREHENSIVE STATEMENT AS TO HOW THE MOVANT CAN BE ADEQUATELY PROTECTED IF THE STAY IS TO BE CONTINUED.  ADDITIONALLY, ANY RESPONSE MUST BE IN WRITING AND FILED WITH THE CLERK, AND A COPY MUST BE SERVED UPON COUNSEL FOR THE MOVING PARTY PRIOR TO THE DATE AND TIME SET FORTH HEREIN.  IF A RESPONSE IS FILED, A HEARING WILL BE HELD WITH NOTICE ONLY TO THE OBJECTING PARTY.**

**IF NO RESPONSE IS FILED AS REQUIRED, THE ALLEGATIONS IN THE CREDITOR'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY SHALL BE DEEMED ADMITTED, UNLESS GOOD CAUSE IS SHOWN WHY THESE ALLEGATIONS SHOULD NOT BE DEEMED ADMITTED, AND AN ORDER GRANTING THE RELIEF SOUGHT MAY BE ENTERED BY DEFAULT.**

**MOTION TO ANNUL THE AUTOMATIC STAY – Page 1**

COMES NOW American Bank of Commerce ("**Commerce**") and files this, its Motion Seeking to Annul or, Alternatively, Seeking Relief From, the Automatic Stay Under 11 U.S.C. § 362 (the "**Motion**"), and would respectfully show this Court as follows:

## SUMMARY

Commerce is a putative secured creditor in this case, and, as the Debtor would have it, has a first and/or second lien on real property described herein as the Austin, Irving, and Kaufman Properties.[1]  Unfortunately for the Debtor, Commerce has already foreclosed the liens on these properties, and only requests that this Court retroactively "annul" the automatic stay to essentially "clear the title" that Commerce received through its foreclosures.  Even though such a request is somewhat extraordinary, the Fifth Circuit has accorded Commerce this right.

Commerce admittedly foreclosed its interests in the Austin, Irving, and Kaufman Properties <u>after</u> FRE filed its bankruptcy petition.  In doing so, however, it did not violate the automatic stay.  Under the Fifth Circuit's decision in *Pinetree* cited below, an exception to the automatic stay is recognized for foreclosures occurring under special circumstances.  To qualify, a secured party must prove that (1) the property in question was "sold" by the initial owner—often a borrower or guarantor—to an entity that later filed for bankruptcy protection, and (2) the creditor's foreclosure of the property was completed without any knowledge of either the bankruptcy, or the "sale."

Here, the Austin, Irving, and Kaufman Properties were all allegedly "sold" by their initial owners—entities that pledged them as collateral for an affiliate's loan with Commerce—to an entity that later became FRE.  No notice was given to Commerce, and no deeds memorializing the alleged "sales" were recorded in the real property records.  Without any knowledge of these

---

[1] All terms used in this Summary, but not defined, shall carry those meanings ascribed to them in the body of the Motion.

**MOTION TO ANNUL THE AUTOMATIC STAY – Page 2**

alleged "sales," Commerce posted the properties for foreclosure, and completed foreclosure proceedings on January 4, 2011.

While FRE filed for bankruptcy protection prior to the foreclosures, it provided no notice to Commerce until after all proceedings had been completed.  Similarly, even though deeds memorializing the alleged "sales" had been signed prior to the foreclosures, they were not recorded until after the foreclosures had been completed—creating a situation where Commerce had no actual or inquiry notice of the alleged "sales" prior to foreclosure.  Because this situation places Commerce squarely within the factual paradigm discussed in *Pinetree*, this Court must annul the automatic stay, and validate the foreclosure proceedings.

## JURISDICTION

1. The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1334(b), 157(b)(2)(G), and 11 U.S.C. § 362(d).

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1408 and § 1409.

## FACTUAL BACKGROUND

A. **The Realco Indebtedness**

3. On or about October 28, 2009, One Realco Corporation ("**Realco**") entered into that certain loan agreement (the "**Agreement**") with Commerce, whereby Commerce agreed to lend Realco the sum of $4,325,855.00 (the "**Realco Indebtedness**").  A true and correct copy of the Agreement is attached hereto as **Exhibit 1**.  To compel Commerce to enter into the Agreement, Realco signed a promissory note with Commerce on or about October 28, 2009 (the "**Note**"), stating that it promised to repay the Realco Indebtedness, plus interest, in monthly

payments beginning on October 28, 2009 and continuing through October 28, 2011.[2]  A true and correct copy of the Note is attached hereto as **Exhibit 2**.

B.     <u>**The Deeds of Trust Secure Repayment of the Realco Indebtedness**</u>

4.    To secure the promises made by Realco in the Agreement and the Note, Thornwood Land and Cattle, LLC ("**Thornwood**"), an affiliate of Realco, provided Commerce with certain deeds of trust (the "**Thornwood Deeds of Trust**"), whereby it granted Commerce first-lien security interests in various real and personal property then owned by Thornwood.

5.    Specifically, Thornwood provided Commerce with a first-lien security interest in various real and personal property more fully described in Exhibit "A" to the deed of trust attached hereto as **Exhibit 3**, including but not limited to 9.961 acres of real property located in Travis County, Texas (the "**Austin Property**"), along with all proceeds from, and all personal property attached to the same (the "**Austin Collateral**").

6.    Similarly, Thornwood also provided Commerce with a first-lien security interest in various real and personal property more fully described in Exhibit "A" to the deed of trust attached hereto as **Exhibit 4**, including but not limited to real property located at 3838 Teleport, Irving, Texas (the "**Irving Property**"), along with all proceeds from, and all personal property attached to the same (the "**Irving Collateral**").

7.    To provide additional security to support the promises made in the Agreement and the Note, TCI Hunters Glen, Inc. ("**Hunters Glen**"), another affiliate of Realco, provided Commerce with a deed of trust (the "**Hunters Glen Deed of Trust**") granting it a second lien in real and personal property known as the Bridgewood Ranch Apartments, located in Kaufman,

---

[2] The Note stated that Realco would pay monthly interest payments to Commerce beginning on October 28, 2009, with a $216,292.75 principal payment due on October 28, 2010, and a balloon payment of all outstanding principal remaining on the Note due and payable on October 28, 2011.

**MOTION TO ANNUL THE AUTOMATIC STAY – Page 4**

Texas (the "**Kaufman Property**"), and more fully described in Exhibit "A" to the deed of trust attached hereto as **Exhibit 5**. This second lien security interest covered approximately 106 apartment units located at the Kaufman Property, all proceeds generated by the same, and other real and personal property (the "**Kaufman Collateral**"). The Hunters Glen Deed of Trust was executed on or about October 28, 2009.

C.     **The Assignment of Leases, Rents and Rights by Thornwood and Hunters Glen**

8.     To provide additional security to guaranty repayment of the Realco Indebtedness, Thornwood entered into those certain Absolute Assignments of Leases, Rents and Rights (the "**Thornwood Assignments**"), whereby Thornwood agreed to "absolutely sell, assign, transfer and set over . . . all of the right, title and interest . . . [to] all rents, earnings, income, profits, benefits and advantages arising from" the Austin and Irving Collateral to Commerce. *See* Thornwood Assignments, at ¶ 1. True and correct copies of the Thornwood Assignments are attached hereto as **Exhibit 6**. Pursuant to the Thornwood Assignments, Realco received a license to use such rents, earnings, income, etc., for so long as no default had occurred under the Note, or any of the other loan documents. *Id.*, at ¶ 2. Such license was to be automatically terminated if any event of default occurred under the Note, or any of the other loan documents. *Id.*, at ¶ 3.

9.     Hunters Glen entered into a similar Absolute Assignment of Leases, Rents and Rights (the "**Hunters Glen Assignment**"), whereby it agreed to "absolutely sell, assign, transfer and set over . . . all of the right, title and interest . . . [to] all rents, earnings, income, profits, benefits and advantages arising from" the Kaufman Collateral to Commerce. *See* Hunters Glen Assignment, at ¶ 1. A true and correct copy of the Hunters Glen Assignment is attached hereto as **Exhibit 7**. Pursuant to the Hunters Glen Assignment, Realco received a license to use such

rents, earnings, income, etc., for so long as no default had occurred under the Note, or any of the other loan documents. *Id.*, at ¶ 2. Such license was to be automatically terminated if any event of default occurred under the Note, or any of the other loan documents. *Id.*, at ¶ 3.

### D. Realco's Default Under the Note

10. Realco failed to make its required monthly interest payment due under the Note. Pursuant to Section 5 of the Note, this failure to make timely payment constituted an event of default. *See* Note, at § 5, p. 2. This default allowed Commerce to pursue its remedies under the Thornwood Deeds of Trust, and the Hunters Glen Deed of Trust, including the eventual posting of the Austin, Irving, and Kaufman Properties for foreclosure. This default also triggered the automatic revocation of Realco's license to use the rents, earnings, income, etc. generated by the Austin, Irving, and Kaufman Properties, that had been assigned to Commerce in the Thornwood and Hunters Glen Assignments.

### E. Commerce Takes Action Post-Default

11. Following Realco's default, and after an attempt to negotiate a mutually-agreeable solution to cure such default, Commerce determined it would enforce its contractual remedies against the Austin, Irving, and Kaufman Properties. On or about December 13, 2010, Commerce's counsel sent Realco, Thornwood, and other entities—including the ultimate parent of FRE—its Notice of Default, Notice of Foreclosure Posting, and Notification of Disposition of Collateral (the "**Notices**"), alerting those parties that Commerce planned to foreclose on the Thornwood and Hunters Glen Deeds of Trust. True and correct copies of the Notices are attached hereto as **Exhibit 8**. Pursuant to the Notices, Commerce posted the Austin, Irving, and Kaufman Properties for a January 4, 2011 foreclosure.

12. On January 4, 2011, Commerce foreclosed on the Thornwood and Hunters Glen Deeds of Trust, and took ownership, via foreclosure deed, of the Austin, Irving and Kaufman Properties. Specifically, Commerce foreclosed on the Austin Property at or around 10:30 a.m., foreclosed on the Irving Property at or around 11:08 a.m., and foreclosed on the Kaufman Property at or around 11:40 p.m.

F. **The Alleged "Sale" of the Properties, and FRE's Bankruptcy Filing**

13. At or around 12:55 p.m., Commerce's counsel, Mr. Rick Hightower, received a telephone call from Mr. Jay LaJone, an attorney for FRE Real Estate, Inc. (the "**Debtor**" or "**FRE**"), stating that the Debtor had filed for Chapter 11 bankruptcy protection. Commerce's foreclosure proceedings had already been concluded by the time of Mr. LaJone's telephone call, and Commerce was in the process of recording the foreclosure deeds in the real property records of Travis, Dallas, and Kaufman counties when this call was received.[3] While Commerce had no knowledge of how it's rights would be affected by the bankruptcy filing of FRE—a non-obligor under the Note, and an entity with which Commerce had never had dealings—it halted all efforts to record its foreclosure deeds out of an abundance of caution.

14. Unbeknownst to Commerce at or before the time of foreclosure, and upon information and belief, Thornwood "sold" the Austin and Irving Properties, and Hunters Glen "sold" the Kaufman Property to an entity named Fenton Real Estate, Inc. ("**Fenton**") on or about December 23, 2010. Upon information and belief, through a name change allegedly occurring on or about December 30, 2010, Fenton became FRE. Thus, when FRE filed for bankruptcy protection on the morning of January 4, 2011 (the "**Petition Date**"), it believed it "owned" the Austin, Irving, and Kaufman Properties.

---

[3] The foreclosure deeds for the Austin and Irving Properties had already been recorded by the time of Mr. LaJone's telephone call. Only the Kaufman deed remained unrecorded at that time.

**MOTION TO ANNUL THE AUTOMATIC STAY – Page 7**

15. Despite this alleged "ownership," neither Fenton, FRE nor any other entity filed deeds in the real property records of Travis, Dallas, and Kaufman counties, respectively, that evidenced such alleged "ownership," or put all other parties on notice regarding the same. Only <u>after</u> all foreclosure proceedings had been concluded by Commerce were such deeds recorded by FRE. At the time Commerce foreclosed on the Austin, Irving, and Kaufman Properties, it had no notice—either actual or otherwise—that those properties had been "sold" to FRE. Similarly, Commerce had no notice that FRE had filed for bankruptcy protection until after all foreclosure proceedings had been concluded.

16. Because Commerce had no notice of either the alleged "sale" of the properties or FRE's bankruptcy filing until after it had concluded its foreclosure proceedings, Commerce was a subsequent purchaser of the Austin, Irving, and Kaufman Properties for value, and therefore took clear title to said properties at the time of foreclosure.

## BASIS FOR RELIEF

### A. The Foreclosure of the Properties did not Violate the Automatic Stay

17. Based on the foregoing facts, it is clear that the automatic stay did not apply to Commerce's foreclosure of the Austin, Irving, and Kaufman Properties. Instructive on this issue is the Fifth Circuit's decision in *In re Pinetree, Ltd.*, which shows that Commerce was a good-faith purchaser of the properties at the foreclosure sales, and that it now holds good title to same, regardless of the FRE bankruptcy.

#### 1) *Pinetree* Holds That a Foreclosure Conducted Without Notice of Prior Sale or Bankruptcy Cannot Violate the Automatic Stay

18. In *Pinetree*, an entity named Pinetree of Louisiana, Inc. ("**Louisiana**") owned a shopping center located in Laurel, Mississippi, which served as security for a $3.2 million promissory note given to Mutual Benefit Life Insurance Company ("**Mutual**"), its lender. *In re*

*Pinetree, Ltd.*, 876 F.2d 34, 35 (5th Cir. 1989). A default under the note occurred in December, 1987. *Id*. In anticipation of filing a bankruptcy petition to stave off foreclosure, Louisiana "sold" the shopping center to an affiliate—Pinetree, Ltd. ("**Pinetree**"). *Id*. However, no deed memorializing the "sale" was ever recorded in the real property records in Mississippi. *Id*. Pinetree ultimately filed for Chapter 11 bankruptcy protection on March 25, 1988, listing the shopping center as its only significant asset. *Id*. Mutual was never provided notice of the bankruptcy filing. *Id.*

19. Having received no notice of the "sale" of the shopping center, or of Pinetree's bankruptcy filing, Mutual sent Louisiana, Pinetree, and Pinetree's general partner notice of the impending foreclosure sale on March 30, 1987, and published notice of the same in the Laurel, Mississippi newspaper.[4] *Id*. The foreclosure sale occurred on April 27, 1988, and no representative of Louisiana or Pinetree appeared at, or objected to the foreclosure. *Id*.

20. Following the foreclosure sale, a dispute arose between Pinetree and Mutual as to whether Mutual violated the automatic stay by foreclosing on the property. *Id.* While the Bankruptcy and District Courts both found Mutual had violated the automatic stay, the Fifth Circuit reversed. *Id.*, at 35-36.

21. In so ruling, the Fifth Circuit noted that while the concept of property of a debtor's estate is very broad, "bankruptcy law does not create property" of a debtor's estate. *Id.*, at 36. In looking at Mississippi law regarding the validity of unrecorded deeds transferring real property, the Court noted that while applicable law did recognize an unrecorded deed as valid between the parties thereto, the Mississippi recording statute treated an unrecorded deed as void

---

[4] Pinetree was the initial obligor under the note, but later sold the property to Louisiana, with full notice to Mutual. *Id*. The note was therefore amended by Mutual and Pinetree to make Louisiana the obligor. *Id*. Notice of the foreclosure sale was provided to Pinetree as a courtesy, because it was the initial obligor under the note. *Id*.

against creditors and subsequent purchasers for value who did not receive notice of the transfer. *Id.* (*citing* Miss. Code Ann. § 89-5-3 (1972); *Craig v. Osborn*, 98 So. 598 (1923); *Morgan v. Mars*, 43 So. 2d 563 (1949)). By Mutual foreclosing without prior notice of the "sale," or of the bankruptcy petition, the Court found that Mississippi law treated the unrecorded "sale" between Louisiana and Pinetree as void.[5] *Pinetree*, at 36. In noting that the bankruptcy court should have annulled the automatic stay as to Mutual's post-bankruptcy foreclosure, the Court postulated the rule that "where a creditor having no knowledge of a pending bankruptcy forecloses in good faith on the collateral, and where the debtor's interest in that collateral is unenforceable against that creditor, and where the debtor, although notified in advance of the foreclosure, failed to assert its status before the foreclosure, we conclude that the automatic stay should have been annulled." *Id.*

  **2) Similar to Mutual's Position, Commerce had no Pre-Foreclosure Notice of the Alleged "Sale" of the Properties, or of FRE's Bankruptcy, Therefore Voiding the Alleged "Sale" and Making Commerce a Purchaser for Value**

22. It is clear from the facts in this case that Commerce must be accorded the same treatment as Mutual was in *Pinetree*. Similar to the facts found in *Pinetree*, Commerce properly noticed its intent to foreclose, received no notice of bankruptcy or objection to the foreclosure sales, and only learned of the alleged "sale" of the properties, and FRE's bankruptcy, following the completion of all three foreclosure sales. Just as the Fifth Circuit in *Pinetree* recognized that Mississippi law voided the "sale" of the shopping center, so too must this Court recognize that Texas law operates to void Thornwood and Hunters Glen's alleged "sale" of the properties to

---

[5] The Court went on to say that "allowing an unrecorded conveyance to bring property into a debtor's estate in such a way as to undermine the rights of those in the record chain of title thwarts the goal of the recording statute. Although Pinetree Plaza, Ltd. held legal title to the shopping center at the date of bankruptcy, its rights were subject to those of Mutual Benefit as a creditor and subsequent purchaser without notice of the bankruptcy or the transfer." *Id.* at 37.

**MOTION TO ANNUL THE AUTOMATIC STAY – Page 10**

FRE. Because Commerce had no pre-foreclosure knowledge of FRE's bankruptcy, and the alleged pre-foreclosure "sale" of the properties must be considered void under Texas law, this Court must find that Commerce is the rightful owner of the properties, and must annul the automatic stay.

### a). Commerce had no Pre-Foreclosure Knowledge of FRE's Bankruptcy

23. It cannot be disputed that Commerce had no notice—either actual or inquiry—of FRE's bankruptcy filing until after all foreclosure sales had been completed.[6] This, however, was not for lack of effort on Commerce's part. Indeed, before and after each foreclosure sale, Mr. Hightower and his associate placed repeated telephone calls to Commerce, and to Mr. Hightower's office, inquiring whether Thornwood, Hunters Glen, or any related entity had provided notice of a bankruptcy filing. No notice was received until 12:55 p.m.—a full hour and fifteen minutes following the foreclosure sale of the Kaufman Property. As Commerce received no notice of the FRE bankruptcy until after it had foreclosed on the Austin, Irving, and Kaufman Properties, this Court must annul the automatic stay, and allow those foreclosure sales to stand.

### b). The Alleged "Sale" to FRE Must be Considered Void

24. The Texas recording statute states: "a conveyance of real property . . . is void as to a creditor or to a subsequent purchaser for a valuable consideration without notice unless the instrument has been acknowledged, sworn to, or proved and filed for record as required by law." Tex. Prop. Code Ann. § 13.001(a). It is clear from the time stamps on the deeds recorded post-foreclosure by FRE that Commerce had no notice of the alleged "sale" of the properties until after it had already foreclosed on the same. Specifically, the time stamp on the deed memorializing the alleged "sale" of the Austin Property (the "**Austin Deed**") shows that it was

---

[6] Indeed, before Mr. LaJone's 12:55 p.m. phone call to Mr. Hightower, Commerce had no knowledge that FRE even existed, much less that it had filed for bankruptcy protection.

**MOTION TO ANNUL THE AUTOMATIC STAY – Page 11**

filed of record at 12:53 p.m. on January 4, 2011—almost two and one-half (2 ½) hours after Commerce foreclosed. A true and correct copy of the Austin Deed is attached hereto as **Exhibit 9**. Similarly, the time stamp on the deed filed by FRE that memorialized the alleged "sale" of the Irving Property (the "**Irving Deed**") shows it was recorded at 2:52 p.m.—almost four (4) hours after Commerce foreclosed. A true and correct copy of the Irving Deed is attached hereto as **Exhibit 10**. Finally, the time stamp on the deed filed by FRE that records the alleged "sale" of the Kaufman Property (the "**Kaufman Deed**") shows it was recorded at 1:47 p.m.—over one (1) hour after Commerce foreclosed. A true and correct copy of the Kaufman Deed is attached hereto as **Exhibit 11**. Because of this failure of notice under the Texas recording statute, the alleged conveyance of the properties from Thornwood and Hunters Glen to Fenton—even if they could be considered valid—must be considered void as against Commerce's interest.

### c). Commerce Must be Considered a "Good Faith Purchaser for Value"

25. As in Mississippi, an entity that rightfully forecloses a deed in Texas is seen as a purchaser of the property for value. *Lee v. Sabine Bank*, 708 S.W.2d 582, 585 (Tex. App.—Beaumont 1986, reh'g denied) (*citing* 39 TEX. JUR. 2d, *Mortgages and Trust Deeds* sec. 191, at 247 (Rev. ed. 1976), and holding that an entity that purchases property at a foreclosure sale is still deemed to be a purchaser for value, even if that entity was the original mortgagee); *Bonilla v. Roberson*, 918 S.W.2d 17, 21 (Tex. App.—Corpus Christi 1996, reh'g overruled) (holding that a foreclosure sale divests a mortgagor of its interest in the subject property, and allows the trustee to convey to the purchaser title to the property); *see also* 11 U.S.C. § 549.

26. Here, it cannot be contended that Commerce improperly foreclosed. Because Commerce properly foreclosed its interests in the Austin, Irving, and Kaufman Properties, and

**MOTION TO ANNUL THE AUTOMATIC STAY – Page 12**

because the alleged "sale" of those properties is considered void under Texas law, Commerce is the rightful owner of those properties.

### d). Despite Notice of the Foreclosure Sales, no Objection was Made

27. Even though Thornwood, Hunters Glen, and multiple other affiliated entities—including FRE's ultimate parent—were put on notice of Commerce's intent to foreclose, no objection was ever made to the foreclosure sales. No calls were made, no e-mails were sent, and no party attended the sales to alert Commerce about the alleged "sale" of the properties to FRE, or about FRE's bankruptcy filing. Where a party is "notified in advance of the foreclosure," yet fails "to assert its status before the foreclosure [as the property's owner]," the Fifth Circuit has concluded that "the automatic stay should . . . be annulled." *Pinetree*, at 36.

### B. To the Extent the Automatic Stay Did Apply to the Properties, the Automatic Stay Should be Retroactively Annulled

28. While Commerce firmly believes that the automatic stay did not apply to the foreclosure of the Austin, Irving, and Kaufman Properties, for reasons noted above, to the extent that the automatic stay did apply to those properties, Commerce requests that this Court annul the same, so as to validate the foreclosure of those properties.

29. It is within the power of this Court to retroactively annul the automatic stay, and therefore validate actions that may have been taken in contravention of the stay. *In re Pulley*, 196 B.R. 502, 504 (Bankr. W.D. Ark. 1996); *In re Hassell*, 2003 Bankr LEXIS 1855 (Bankr. N.D. Tex. Dec. 16, 2003). A court may consider the following circumstances when determining whether to annul the automatic stay: (1) if the creditor had actual or constructive knowledge of the bankruptcy filing, and therefore the automatic stay; (2) if the debtor has acted in bad faith; (3) if there was equity in the property of the estate; (4) if the property was necessary for an effective reorganization; (5) if grounds for relief from the stay existed and a motion to lift stay would have

been granted prior to the violation; (6) if failure to grant retroactive relief would cause unnecessary expense to the creditor; and (7) if the creditor has detrimentally changed its position on the basis of the action taken. *Id*.; *See also In re Thornburg*, 277 B.R. 719, 731 (Bankr. E.D. Tex. 2002).

30.     Were this Court to apply the foregoing factors, it would be clear that the automatic stay should be annulled. First, it has been established that Commerce had no actual or constructive knowledge of FRE's bankruptcy filing. Second, it appears that FRE's bankruptcy filing fits squarely within the Fifth Circuits *Little Creek* test for determining bad faith.[7]  Third, the Debtor's property is not necessary for an effective reorganization, because no reorganization in this case is possible, or even probable. Fourth, grounds to grant relief from the automatic stay certain exist, including for cause, and due to a lack of adequate protection. Finally, a failure to grant retroactive relief would only cause Commerce additional unnecessary expense, since it would then be required to seek relief from the stay, and conduct a second set of foreclosure sales.

31.     While Commerce does not believe that the automatic stay applies to its foreclosure of the Austin, Irving, and Kaufman Properties, to the extent that this Court disagrees,

---

[7] In *Little Creek*, the Fifth Circuit looked to a set of non-exclusive factors it found determinative of a bad-faith bankruptcy filing. *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072-73 (5th Cir. 1986). These factors include the Court looking at (1) whether the debtor has one asset, such as a tract of undeveloped property, (2) whether there are any employees, except for the principals, (3) whether there is any cash flow or other sources of income to sustain a plan or make adequate protection payments, (4) the number of unsecured creditors, and the size of their claims, (5) whether the property in question has been posted for foreclosures because of debt arrearages, (6) whether the debtor and one creditor may have proceeded to a stand-still in state court, (7) whether the debtor has lost in state court litigation, and is therefore required to post a bond in order to appeal, (8) whether bankruptcy offers the only hope of forestalling the debtor's loss of the property, (9) whether there are allegations of wrongdoing by the debtor, and (10) whether an entity has been created or "revitalized" on the eve of foreclosure to hold the debtor's asset or assets. *Id*.

The facts surrounding FRE's bankruptcy filing show that many of these tests are met, and that its bankruptcy was filed in bad faith. Specifically, other than its principals, FRE has few to no employees, much of the property held by the Debtor has no cash flow, and would not be susceptible to reorganization if it was not "rolled up" with separate income-producing property, the claims of unsecured creditors are relatively small when compared with the secured creditor body, and most, if not all of Debtor's property was posted for foreclosure immediately pre-petition in a "revitalized" entity which became FRE. *See id.* Clearly, these factors strongly indicate that FRE's bankruptcy was filed in bad faith.

**MOTION TO ANNUL THE AUTOMATIC STAY – Page 14**

Commerce requests that it consider the above-listed factors and retroactively annul the automatic stay, thus validating Commerce's post-petition foreclosure sales.

C. **To the Extent the Automatic Stay Applies in This Instance, the Automatic Stay Should be Lifted, and Commerce Should be Allowed to Exercise its Contractual Remedies**

32.  "On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay . . . (1) for cause, including the lack of adequate protection of an interest in property . . . [or] (2)(A) if the debtor does not have equity in such property; and (B) such property is not necessary to an effective reorganization." 11 U.S.C. § 362(d).

   1). **Cause Exists to Lift the Automatic Stay**

33.  It is clear that cause certainly exists to lift the automatic stay in this instance. Because Section 362 of the Bankruptcy Code does not specify exactly what circumstances constitute "cause" to lift the automatic stay, Courts are given latitude to determine what constitutes "cause" on a case-by-case basis. *In re Reitnauer*, 152 F.3d 351, 343 n.4 (5th Cir. 1998). Courts have found that the existence of bad faith in the commencement of a bankruptcy case certainly is sufficient "cause" for the lifting or annulment of the automatic stay. *In re Duvar Apt.*, 205 B.R. 196 (9th Cir. B.A.P. 1996). As previously discussed, it is clear that FRE meets the *Little Creek* standards for a court to determine that its bankruptcy was filed in "bad faith." As such, cause certainly exists for this Court to lift the automatic stay as to the Austin, Irving, and Kaufman Properties.

34.  Additionally, it is clear from FRE's own cash collateral exhibits that it believes Commerce is woefully undersecured by the value of the Austin and Irving Properties.[8] As those properties produce no income, and this Court has forbidden the Debtor from using income from

---

[8] While the Realco Indebtedness stands at over $4.3 million, FRE only values the Austin and Irving Properties, together with a separate property, at slightly more than $1.6 million.

**MOTION TO ANNUL THE AUTOMATIC STAY – Page 15**

an income-producing property to pay the expenses of a non-income-producing property, the Debtor cannot adequately protect Commerce's interest in the same. Because Commerce cannot be adequately protected in this case, the Court must lift the automatic stay as to those properties.

35. Finally, it is clear that "cause" to lift the automatic stay exists because FRE no longer holds any ownership interest in the Austin, Irving or Kaufman Properties. As any and all ownership interest FRE might have ever had was foreclosed by Commerce on January 4, 2011, the properties cannot be considered part of FRE's bankruptcy estate, and cannot be administered by this Court. In this circumstance, the Court must recognize it's lack of jurisdiction over the properties, and must lift the automatic stay to allow Commerce to use and enjoy property it rightfully and properly foreclosed upon.

**2).    The Debtor Has no Equity in the Properties, and They are not Necessary for an Effective Reorganization**

36. It is clear from the facts that the Debtor has no equity in the properties. Indeed, because the alleged "sale" of the properties is considered void as against Commerce's interest, and Commerce's foreclosure of its interests are valid, any equity FRE may have had in the properties has been terminated through the foreclosure process. Similarly, the properties are not necessary to FRE's reorganization, because FRE has no remaining ownership interest in those properties (if it ever had any such ownership interest to begin with). As FRE has no equity in the Austin, Irving, and Kaufman Properties, and they are not necessary to FRE's reorganization, this Court must lift the automatic stay as to those properties.

WHEREFORE, PREMISES CONSIDERED, Commerce respectfully requests that this Court (1) annul the automatic stay due to the fact that it never truly applied to the Austin, Irving, and Kaufman Properties, (2) alternatively, annul the automatic stay because the same is warranted under the factors found in *Pulley* and *Hassell*, (3) alternatively, lift the automatic stay

for cause, because FRE filed its bankruptcy petition in "bad faith," (4) alternatively, lift the automatic stay for cause because FRE cannot adequately protect Commerce's interests in the Austin, Irving, and Kaufman Properties, (5) alternatively, lift the automatic stay for cause because FRE has no ownership interest in the Austin, Irving, and Kaufman Properties, the same are not part of its bankruptcy estate, and this Court has no jurisdiction over the same, or (6) alternatively, lift the automatic stay because FRE has no equity in the Austin, Irving, and Kaufman Properties, and the same are not necessary for FRE's successful reorganization. Additionally, Commerce requests that (1) this Court lift the automatic stay so that Commerce may exercise any remedies it may have under state law, including but not limited to the appointment of a receiver to gather and account for Commerce's cash collateral, and (2) it be granted any further relief to which it may be entitled.

Submitted this 25th day of January, 2011.

/s/ Andrew E. Jillson
Andrew E. Jillson
Texas State Bar No. 10666370
Cameron W. Kinvig
Texas State Bar No. 24055780
Hunton & Williams LLP
1445 Ross Avenue, Suite 3700
Dallas, Texas 75202
Telephone: 214-979-3000
Telecopy: 214-979-3963

**ATTORNEYS FOR AMERICAN BANK OF COMMERCE**

**Certificate of Conference**

  The undersigned hereby certifies that he discussed the substance of this motion with counsel for FRE on January 20, and that the parties could not reach an agreement as to the relief requested herein at that time.

                /s/ Cameron W. Kinvig
                Cameron W. Kinvig

**Certificate of Service**

  The undersigned hereby certifies that the foregoing motion was served on all parties-in-interest requesting notice via this Court's ECF electronic filing system. To the extent that a party-in-interest requesting notice does not receive the same via this Court's ECF system, the same will be provided via U.S. Mail, First Class, facsimile, and/or e-mail.

                /s/ Cameron W. Kinvig
                Cameron W. Kinvig