Michael D. Warner, Esq., Texas Bar No. 00792304
**COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.**
A Professional Corporation
301 Commerce Street, Suite 1700
Fort Worth, Texas  76102
817-810-5250
817-810-5255 Facsimile
mwarner@coleschotz.com

Leo Leyva, Esq., New York Bar No. RS2296408
**COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A.**
A Professional Corporation
900 Third Avenue, 16th Floor
New York, NY 10022
212-752-8000
201-678-6294 Facsimile
lleyva@coleschotz.com
Admitted via Pro Hac Vice


Attorneys for Highland Capital Management, L.P.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re | : Case No. 11-30210-BJH-11 |
| | : |
| FRE REAL ESTATE, INC., | : Chapter  11 |
| | : |
| Debtor. | : Hearing Date:  March 3, 2011 |
| | : Hearing Time: 1:15 p.m. |
| | : |
| | : |

## MOTION OF HIGHLAND CAPITAL MANAGEMENT, L.P. FOR ORDER
## TERMINATING DEBTOR'S EXCLUSIVITY PERIOD
## PURSUANT TO 11 U.S.C. SECTION 1121(d)

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... ii

I.     INTRODUCTION ............................................................................... 3

II.    JURISDICTION ................................................................................. 8

III.   BACKGROUND ................................................................................ 9

       A.     The Loan Documents – the Fenton Transaction ..........................................9

       B.     The Fenton Loan Maturity and Fenton Loan Modifications ....................10

       C.     State Court Foreclosure – Fenton Property................................................14

       D.     Multiple Entities Attempt to Roll-up Collateral of Multiple
             Lenders Into One Entity............................................................................15

IV.   RELIEF REQUESTED....................................................................... 22

76332/0022-7348570v1

# TABLE OF AUTHORITIES

**Page(s)**

CASES

In re 266 Washington Assocs., 141 B.R. 275 (Bankr. E.D.N.Y. 1992)........................28

In re Adelphia Commc'ns Corp., 352 B.R. 578 (Bankr. S.D.N.Y. 2006) .....................24

In re Ashgrove Apts. of DeKalb County, Ltd., 121 B.R. 752 (Bankr. S.D. Ohio
        1990) ................................................................................................................28

In re B-PVL1, LLC, 2010 WL 4853299 (Bankr. D. Nev. Jan. 22, 2010) ....................27

In re Dow Corning Corp., 208 B.R. 661 (Bankr. E.D. Mich. 1997)........................24, 28

In re Express One Int'l, Inc., 194 B.R. 98 (Bankr. E.D. Tex. 1996) ............................24

Federal Deposit Insurance Corp. v. International Property Management, Inc., 929,
        F.2d 1033, 1035-36 (5th Cir. 1991) ................................................................26

In re Four Bucks, LLC, 2009 WL 1857432 (Bankr. N.D. Tex. 2009) ..........................26

In re Gen. Bearing Corp., 136 B.R. 361 (Bankr. S.D.N.Y. 1992) ...............................24

Geriatrics Nursing Home v. First Fid. Bank, N.A., 187 B.R. 128 (D.N.J. 1995)..........24

In re Grossinger's Assocs., 116 B.R. 34 (Bankr. S.D.N.Y. 1990).................................24

In re Henry Mayo Newhall Mem'l Hosp., 282 B.R. 444 (9th Cir. BAP 2002)........24, 28

In re Hoffman, 52 B.R. 212 (Bankr. D.N.D. 1985) ......................................................27

In re Made in Detroit, Inc., 299 B.R. 170 (Bankr. E.D. Mich. 2003)...........................27

In re Marston Enter., Inc., 13 B.R. 514 (Bankr. E.D.N.Y. 1981) .................................28

In re Mid-State Raceway, Inc., 323 B.R. 63 (Bankr. N.D.N.Y. 2005).........................25

In re Pub. Serv. Co. of N.H., 99 B.R. 155 (Bankr. D.N.H. 1989) ................................28

In re Ralph C. Tyler, P.E., P.S., Inc., 156 B.R. 995 (Bankr. N.D. Ohio 1993) ............27

In re Save Our Springs (S.O.S.) Alliance, Inc., 388 B.R. 202 (Bankr. W.D. Tex.
        2008) ................................................................................................................27

In re Stratford Assocs. Ltd. P'ship, 145 B.R. 689 (Bankr. D. Kan. 1992) ....................27

ii

In re Sun Valley Newspapers, Inc., 171 B.R. 71 (9th Cir. BAP 1994)....................................27, 28

In re Timbers of Inwood Forest Assocs., Ltd., 808 F.2d 363 (5th Cir. 1987) .........................24, 27

In re Trans Max Techs., Inc., 349 B.R. 80 (Bankr. D. Nev. 2006)....................................24, 26, 27

In re Walker, 165 B.R. 994 (E.D. Va. 1994) .............................................................................27

STATUTES

11 U.S.C. §101(51B) .................................................................................................................22

11 U.S.C. § 362(d)(3) ...............................................................................................................23

11 U.S.C. § 1121 ..................................................................................................................23, 24

11 U.S.C. § 1129(a)(11)............................................................................................................26

28 U.S.C. § 157(b)(2)(A) and (O)..............................................................................................8

28 U.S.C. § 1334.........................................................................................................................8

76332/0022-7348570v1

Highland Capital Management, L.P. ("HCMLP")[1] moves for an Order pursuant to Section 1121(d) of Title 11 of the United States Code §§101, *et seq.*, as amended (the "Bankruptcy Code"), terminating FRE Real Estate, Inc.'s (the "Debtor") exclusivity period in which to file a plan of reorganization or liquidation (this "Motion"). HCMLP moves the Court on multiple grounds, including and most important that the best interests of all parties involved in this Case are addressed by an expedited plan process. Further, as explained below, the plan proposal outlined herein is the only reasonable and viable plan that can be confirmed for the Debtor and thus any delay in presenting such a plan to the Court is injurious to the creditors of the Estate[2].

The difficulties the Debtor faces in attempting to propose a plan of reorganization stem from the fact that, as detailed below, the Debtor is nothing more than the nominal holder of 38 properties, transferred to the Debtor on the eve of the filing of the Petition, where most, if not all, of the properties have no equity over and above (and in some instances, millions of dollars less than) the secured debt. Under such circumstances it is virtually impossible to propose a plan that would address a treatment likely to be accepted by secured creditors, many of which will have significant deficiency claims that will *swamp* and control any unsecured class or classes of creditors. In addition, by the

---

[1]    HCMLP is the special servicer ("Special Servicer") for that certain indebtedness evidenced by (1) that certain Loan Agreement dated January 19, 2007 (as amended, restated, replaced or supplemented) between TCI Park West II, Inc., a Nevada corporation ("Park West"), now known as FRE Real Estate, Inc., the Debtor herein, and NexBank SSB ("NexBank"), as Agent for itself and other participating lenders (collectively, the "Lenders"); and (2) that certain Promissory Note (as amended, restated, replaced or supplemented) dated January 19, 2007, in the original principal amount of $62,000,000, executed by Park West for the benefit of the Lenders (the "Note"). The Note and other related transactional documents are addressed further herein below. Actions taken herein and historical actions addressed herein are by HCMLP in it capacity as Special Servicer.

[2]    By the time the Court considers this Motion on March 3, 2011, this Case will have been pending 59 days.

Debtor's own admissions, many of the properties transferred into the Debtor have no cash

flow, and thus need financial support from a third party source.  Further, notwithstanding

the *roll-up* of 19 entities into the Debtor, there is no relationship by and among the 38

parcels of property, save for the fact that each was owned, pre-Petition, by an insider

and/or affiliate of the Debtor.  Based upon the foregoing, the Debtor lacks a reasonable

possibility of a successful reorganization within a reasonable time.

By contrast the plan proposal of HCMLP outlined below and the draft plan

attached as **Exhibit B** provides a structure designed to immediately maximize the value

of the properties for the benefit of all interested parties, by implementing an organized

sale process that affords all interested parties, including equity holders, the opportunity to

bid on the properties.  **It should not be surprising that the Debtor actually**

**acknowledges and agrees that a sale process for the properties is appropriate for the**

**Debtor**.  At his January 27, 2011, deposition Richard David Morgan, the Debtor's Vice

President and Chief Restructuring Officer, stated that it is ultimately his intent to sell the

properties transferred into the Debtor.  Now is the time to do so.

Finally, termination of exclusivity is justified on the basis that the Debtor and its

insiders/affiliates[3] have acted in bad faith as detailed herein.

HCMLP anticipates that other secured lenders will support this Motion[4].

---

[3]       Since facts are still being developed, this Motion uses the term "insiders/affiliates" to include
entities believed to be insiders and/or affiliates, as well as insiders or affiliates of insiders or affiliates, as
such terms are used and/or defined in either the Bankruptcy Code and/or Title 15 of the United States Code.

[4]       HCMLP is aware that at least two motions seeking the dismissal of this Case are currently pending
and a hearing is scheduled on February 3, 2011.  HCMLP believes that this Motion is an alternative to such
motions, and thus other secured lenders are likely to file pleadings supporting the relief sought herein.

76332/0022-7348570v1

## I.     <u>INTRODUCTION</u>

1.     In direct response to HCMLP's foreclosure sale scheduled on January 4, 2011, TCI Park West II, Inc. ("<u>Park West</u>"), now known as FRE Real Estate, Inc., the Debtor herein, and its insiders/affiliates embarked on a campaign to intentionally delay HCMLP's exercise of its enforcement rights and orchestrated multiple transactions to intertwine the properties and assets of multiple single asset real estate entities.

2.     More specifically, as the Debtor has admitted, multiple parcels of real property, owned by entities other than the Debtor, many of which were subject to foreclosure sales scheduled on January 4, 2011[5], were transferred to the Debtor on the eve of the filing of this Case in order to thwart such scheduled foreclosure sales. Through the machinations of the Debtor's insiders/affiliates, the foreclosure sales were abruptly halted through the filing of this single Chapter 11 Case.  Many of the actions of the Debtor and its insiders/affiliates that rise to the level of bad faith would not have existed had each of the transferor entities (the insiders/affiliates) simply addressed their own respective financial structures using whatever legal rights they possessed.  In other

---

[5]     State Bank of Texas had a foreclosure sale scheduled on January 4, 2011, with respect to, *inter alia*, six contiguous tracts of real property in Dallas County, Texas owned by Coventry Pointe, Inc.  See, *Motion of State Bank of Texas Seeking to Annul or, Alternatively, Seeking Relief From, the Automatic Stay, etc.* [Docket number 56].   First Bank & Trust Co. and The Bank of Weatherford also collectively had a foreclosure sale scheduled on January 4, 2011, with respect to, *inter alia*, a 10-acres tract of vacant land in Dallas, Texas owned by IORI Centura, Inc.  See, *Motion of First Bank & Trust Co. and the Bank of Weatherford to Retroactively Annul the Automatic Stay* [Docket number 46].
     In addition the following properties all appeared on the January 4, 2011 Roddy Real Estate Foreclosure List: (a) the property commonly known as the *Parkway North Office Building*, owned by Transcontinental Westgrove, Inc., and subject to the lien of U.S. Bank, National Association; (b) the property commonly know as *Valwood/Mercer Crossing*, owned by American Realty Trust, Inc. and subject to the lien of Armed Forces Bank, N.A.; (c) the property commonly known as the *Kinwest tract* owned by Transcontinental Realty Investors, Inc., and subject to the lien of Armed Forces Bank, N.A.; and (d) the property commonly known as *Wilmer 88* owned by Transcontinental Realty Investors, Inc., and subject to the lien of RMR Investments, Inc.

76332/0022-7348570v1

words, each individual transferor could have resorted to their respective rights and filed their own respective Chapter 11 cases –but they did not.

3.     **The numbers speak for themselves - - 38 properties, owned by at least 19 different entities, that affect 11 different secured lenders were transferred to the Debtor on the eve of the filing of this Case**.  In order to depict the scope and magnitude of the actions of the Debtor, and its insiders/affiliates, HCMLP has pieced together, from the limited pleadings and discovery conducted to date **Exhibit A** hereto which is a chart of the various properties, the names of the former owners of such properties and the secured lenders having liens against such properties (the "Summary Schedule").[6]  The Summary Schedule provides an overview and insight into the frenetic restructuring and bad faith conduct of the Debtor and its insiders/affiliates on the eve of filing this Case. Based on the facts and circumstances presented herein, the Debtor should <u>not</u> be

---

[6]      HCMLP is continuing to gather facts and information regarding the properties and entities at issue and will submit a revised Summary Schedule to reflect any changes and/or additional information it obtains.  Since, discovery is on going the information regarding the entities and properties is likely not complete.  In pleadings filed by the Debtor, it is stated that the Debtor owns 38 properties.  <u>See</u>, *e.g.* Docket numbers 41 and 51.  At the hearing on January 19, 2011, on the *Motion to Compel Discovery, etc.* filed by Wells Fargo Capital Finance, Inc. [Docket number 38], the Debtor's counsel represented to the Court that 36 properties were owned by the Debtor that were transferred to the Debtor by 19 entities.  Thus, it is clear that the quantity of properties transferred into and/or owned by the Debtor, as well as the quantity of insiders/affiliates that pre-petition transferred property to the Debtor is still being determined and compiled.
       The source of information contained within the Summary Schedule is gathered from pleadings filed by interested parties, including the Debtor, as well as from Exhibits presented by the Debtor at the Interim Hearing held on January 20, 2011, on the Debtor's *Emergency Motion for Interim and Final Orders Authorizing the Debtor to use Cash Collateral, etc.* [Docket number 52], and in particular Exhibit 1 admitted by the Court.  From the foregoing, the Summary Schedule addresses 39 properties (only one of which, the Fenton Property (addressed below), was historically owned by the Debtor, well prior to the Petition Date).  The Summary Schedule also addresses transfers into the Debtor from 19 other insiders/affiliates entities.  Finally, the Summary Schedule addresses the liens held by 11 different lenders.
       In connection with the ongoing discovery with respect to pending Motions to Dismiss (<u>See</u>, Footnote 4, *supra*), the Debtor has and continues to supply documents with respect to, *inter alia*, the various transactions by and among the Debtor and its insiders/affiliates by which the properties addressed in the Summary Schedule were transferred, pre-petition to the Debtor.  Such exhibits are clearly within the Debtor's possession, as the same are being produced by the Debtor, and such exhibits are voluminous. Nevertheless, HCMLP will file a supporting pleading containing each of the exhibits addressing and evidencing the transfers among the Debtor and its insiders/affiliates.

4

permitted to prolong this Chapter 11 Case and the secured lenders should be afforded their rights and remedies.

4.      There is only one viable plan that can be filed for such an inappropriately orchestrated *roll-up* of multiple entities that fosters the Bankruptcy Code's multiple objectives, including a fair and reasonable treatment for all interested parties - - a plan that is structured to permit the secured lenders to exercise their respective contractual rights while concurrently affording the Debtor and its insiders/affiliates the right to preserve what they and only they perceive as equity[7] in some of the properties, and protects general unsecured creditors, who also have been harmed by the Debtor's and its insiders/affiliates' actions.

5.      To expedite the process towards such a plan for the Debtor, HCMLP seeks an order of the Court terminating the Debtor's exclusivity period in order to immediately file a fair and balanced plan that affords all parties their respective rights.   To demonstrate the seriousness of HCMLP's desire to present to the Court and all interested parties a plan that meets these objectives, attached hereto as **Exhibit B** is a draft plan that provides for Court-approved bidding procedures followed by post-confirmation sales of each of the 39 properties now allegedly owned by the Debtor (the "Draft Plan").[8]

---

[7]      As detailed herein, the Debtor and its insiders/affiliates concocted a series of transactions designed to artificially create a *paper* equity in the properties transferred on the eve of the filing of this Case. However, as demonstrated in Paragraph 27, *infra*, the equity was never and currently is not held by the Debtor for the benefit of creditors, but rather held by the Debtor's insiders/affiliates, the same entities that created the synthetic equity.  Thus, the continuation of the Debtor's exclusivity is not necessary to preserve the magically created equity.

[8]      By the time this Motion is considered by the Court, the Draft Plan is likely to be modified and/or amended based upon additional facts and information regarding the properties, as well as the expected input of other interested parties.   The basic structure of the Draft Plan, however, is likely not to change.

6.    The Draft Plan is designed to address the following:

- Provide an orderly process for managed sales of each of the properties with procedures approved by the Court;

- Provide secured lenders the right, subject to objection, to credit bid the amount of their secured debt with regard to their respective collateral;

- Provide the Debtor and its insiders/affiliates the ability to participate in the sale process and introduce new money to satisfy the liens of secured lenders;

- Provide the Debtor and its insiders/affiliates the ability to negotiate directly with secured lenders to offer a restructuring of the secured lender's indebtedness as an alternative to the sale of the secured lender's collateral; and

- Maintains a level playing field for all parties in interest during the sale process without extinguishing the rights of any parties.

7.    The Draft Plan provides a logical method of unwinding the properties and various entities that were *rolled-up* into this Debtor and addresses each of those properties and their respective secured lenders' rights and remedies as well as the general unsecured creditors.  Specifically, the Draft Plan provides for the marketing and sale of each of the 39 properties at a post-confirmation sale, where, alongside other potential purchasers, the secured lenders for each of the properties would have the right to credit bid up to the amount of their secured debt.  The successful bidder at the sale will be entitled to own the subject property, free and clear of all liens, claims and encumbrances. In the event the successful bidder is a party other than the secured lender for that respective property, any surplus proceeds in excess of the secured lender's secured lien shall be distributed to unsecured creditors having valid claims against the entity that

6

formerly held title to the property before the property was transferred to the Debtor.  The

Draft Plan provides an economically feasible disposition of each of the real properties

that secure the substantial indebtedness owed to the secured lenders having liens against

such properties.

8.    While HCMLP's primary ground for seeking the termination of the

Debtor's exclusivity is to permit the filing of a plan providing for the liquidation of the

various properties *rolled-up* and into the Debtor.   HCMLP also seeks such relief in

recognition and acknowledgment of the inappropriate actions of the Debtor and its

insiders/affiliates that have interfered with legitimate rights that the parties in interest

would otherwise have had.  More specifically, the Debtor and its insiders/affiliates have:

- Used the Bankruptcy Code as a shield to avoid multiple January 4, 2011, foreclosure sales, with no legitimate prospect of reorganization;

- Created the Debtor's structure and asset holdings in a manner designed to circumvent legitimate rights that would otherwise be afforded to parties in interest, pursuant to the Bankruptcy Code in single asset real estate ("SARE") cases;

- Intentionally and knowingly violated loan documents among the various secured lenders and the Debtor's insiders/affiliates, including by transferring assets to other insiders/affiliates;

- Combined at least 20 (including the Debtor) entities (many of which are SARE entities), with a combined secured debt in excess of $195 million, and an aggregate of 38 parcels of property into one entity;

7

- Created a structure to frustrate the rights of all creditors, secured and unsecured;

- Deprived creditors of any unencumbered cash flow to manage and/or operate the mortgaged properties;

- Failed to provide any cognizable plan to address the substantial indebtedness on one, much less each, of the mortgaged properties; and

- Devised this perplexing conglomeration of entities, properties and structures, with no legitimate prospect of reorganization.

9.      Unless the Court intervenes and terminates the Debtor's exclusivity, the Debtor will continue to flout the protections afforded to creditors in contractual agreements and pursuant to the Bankruptcy Code.

## II.      JURISDICTION

10.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A) and (O).

8

## III.   BACKGROUND

### A.   The Loan Documents – the Fenton Transaction[9]

11.    On January 19, 2007, NexBank advanced a loan in the original amount of

$62 million (the "Fenton Loan") to Park West in connection with Park West's purchase

of real property located off the LBJ Freeway in Farmers Branch, Texas, consisting of

land and approximately 700,000 square feet of commercial office space known as the

Fenton Centre (the "Fenton Property")[10].  After funding the Fenton Loan to Park West,

NexBank, as the Fenton Loan's original lender, sold participations and assigned various

interests in the Fenton Loan to other financial institutions that together compromise the

current lenders (collectively, the "Fenton Lenders").

12.    The Fenton Loan was evidenced by a Promissory Note dated January 19,

2007, (the "Fenton Note") and Loan Agreement dated January 19, 2007 (the "Fenton

Loan Agreement").  True copies of the Fenton Note and the Fenton Loan Agreement are

attached as **Exhibits C** and **D**, respectively.  The Fenton Loan Agreement appointed

NexBank, a state savings bank, as the administrative agent (the "Fenton Agent") for the

---

[9]       Since this Motion is being brought at this time solely by HCMLP, the Motion only addresses the
pre-petition transactions and related documents, by and among the Debtor, its insiders/affiliates and
HCMLP.  As other secured lenders and interested parties join in this Motion, as anticipated by HCMLP, it
is expected that the pre-petition transactions and related documents with respect to such other secured
lenders will have similar historical structures, especially with respect to the multiple breaches of such
documents by the Debtor and its insiders/affiliates.  By way of example, the *Motion to Dismiss*, etc. filed
by Wells Fargo Capital Finance, Inc., [Docket number 23] provides a detailed history of defaults and
forbearances, among other transactional events between Well Fargo Capital Finance, Inc. and its borrower,
TCI Texas Properties, LLC.
        The history of the pre-petition relationship among the Debtor, its insiders/affiliates and HCMLP is
necessarily relevant to a Motion to terminate exclusivity, as it demonstrates the bad faith of the Debtor and
its insiders/affiliates.  In addition, it is important that the Court is aware of the lengthy efforts to resolve the
ongoing defaults by the Debtor prior to the scheduled foreclosure on January 4, 2011, only to be stopped
literally moments before such sale, by the intentionally and protracted actions of Park West and its
insiders/affiliates.  As described herein, HCMLP extended concessions to the Debtor and its
insiders/affiliates in an attempt to avoid foreclosure and litigation, but the Debtor and its insiders/affiliates
persisted in breaching obligations owed to HCMLP and the Fenton Lenders.

[10]      See, Line 1, Exhibit A.

Fenton Loan and gave the Fenton Agent the right to pursue remedies under, *inter alia*, the Fenton Loan Agreement.  As the Fenton Agent, NexBank delegated certain Fenton Loan administration responsibilities to HCMLP as the Special Servicer, including the right to pursue remedies on the Fenton Lenders' behalf.

13.     In connection with the Fenton Loan transaction, Park West executed and delivered a Deed of Trust (the "Fenton Deed of Trust") that granted the Fenton Agent, among other things, a security interest in the Fenton Property.  A true copy of the Fenton Deed of Trust is attached as **Exhibit E**.

14.     To further secure the Fenton Loan, Park West's parent, Transcontinental Realty Investors, Inc. ("Transcontinental"), executed and delivered a Guaranty Agreement (the "Guaranty") in favor of the Fenton Agent.  A true copy of the Guaranty is attached as **Exhibit F**.  That Guaranty obligated Transcontinental to guaranty the entire repayment of the Fenton Loan to the Fenton Agent on behalf of the Fenton Lenders.  The Fenton Loan Agreement, the Fenton Note, the Fenton Deed of Trust, the Guaranty, and all other related Fenton Loan documents and agreements, including amendments thereto, are collectively referred to herein as the "Fenton Loan Documents."

### B.     The Fenton Loan Maturity and Fenton Loan Modifications

15.     On January 31, 2009, the Fenton Loan matured and all amounts under the Fenton Loan became due and payable.  HCMLP requested that Park West fulfill its obligations under the Fenton Loan Documents and pay off the Fenton Loan, which at the time totaled $62,235,244.79.  Park West failed and refused to satisfy its obligations pursuant to the terms of the Fenton Loan Documents.

16.     On May 1, 2009, after the parties engaged in extensive negotiations regarding a modification of the Fenton Loan, the parties entered into a Loan Modification

10

Agreement (the "<u>First Fenton Loan Modification</u>"), which afforded Park West with additional time to repay the Fenton Loan.   A true copy of the First Fenton Loan Modification is attached as **Exhibit G**.  In connection with the Fenton Loan modification, Transcontinental and Income Opportunity Realty Investors, Inc., another insider/affiliate of the Debtor ("<u>Income Realty</u>") executed and delivered a Deed of Trust (the "<u>Fenton Supplement Deed of Trust</u>") in favor of KeyCorp Real Estate Capital Markets, Inc. (as agent for the Fenton Lenders), granting a security interest in certain parcels of land known as: (i) Thermalloy Building, Lot 1 of Kennington Square Addition, Farmers Branch, Texas (the "<u>Transcontinental Property</u>")[11]; and (ii) Three Hickory Addition, Lot 1, Block A, Farmers Branch, Texas (the "<u>Income Realty Property</u>")[12].  A true copy of the Fenton Supplemental Deed of Trust is attached as **Exhibit H**.

17.    Shortly after the execution of the First Fenton Loan Modification, Park West defaulted on its obligations.   After a series of additional discussions and negotiations, the parties agreed to a second modification of the Fenton Loan (the "<u>Second Fenton Loan Modification</u>") executed on September 15, 2009.  A true copy of the Second Fenton Loan Modification is attached as **Exhibit I**.   The Second Fenton Loan Modification extended the Fenton Loan term to April 1, 2010, (with an optional extension to April 1, 2011, subject to certain conditions), and required Park West to enter into a contemporaneous Cash Management Agreement (the "<u>CMA</u>") in exchange for HCMLP's agreement to cease reposting the foreclosure sale, which had previously been scheduled for June 2, 2009.  A true copy of the CMA is attached as **Exhibit J**.

---

[11]    <u>See</u>, Line 4, Exhibit A.

[12]    <u>See</u>, Line 2, Exhibit A.

76332/0022-7348570v1

18.    The CMA was a critical component of the Second Fenton Loan Modification and served as the primary inducement for HCMLP's agreement to enter into the Second Fenton Loan Modification in lieu of reinitiating foreclosure. The CMA, among other things, required Park West to direct all payments from the tenants of the Fenton Property to a bank account controlled by HCMLP (the "Lockbox Account").

19.    Pursuant to the CMA, upon Park West providing a budget-to-actual expense reconciliation, payments made to the Lockbox Account would be applied toward reimbursing Park West's expenses associated with the Fenton Property pursuant to a payment structure and procedure set forth in the CMA. The CMA also required Park West to hold in trust for HCMLP any funds inadvertently received by Park West from tenants, and gave HCMLP unilateral control of the Lockbox Account, a provision intended to prevent Park West from wrongfully withholding payments due to HCMLP in the future.

20.    To add insult to injury, on or about December 18, 2009, the Debtor received a lease termination fee of $1.85 Million from one of its tenants, THQ, Inc. (the "THQ", and the "THQ Payment"). Despite express written instructions directing tenants of the Fenton Property to submit payments to the Lockbox, in accordance with the CMA, THQ was somehow directed to send the THQ Payment directly to Regis, the Debtor's agent and an insider/affiliate of the Debtor. HCMLP did not discover the THQ Payment until almost six months later, when, after repeated requests, the Debtor finally provided HCMLP with the rent roll for the Fenton Property, which indicated that THQ was no longer a tenant. Pursuant to the Loan Documents the Debtor was obligated to notify HCMLP or NexBank of any early lease termination notice (and certainly any related

76332/0022-7348570v1

termination payment) but willfully withheld that information.  Moreover, as HCMLP's auditor later discovered, the Debtor immediately transferred the THQ Payments to Transcontinental Realty Investors, Inc., and misappropriated the funds for purposed unrelated to the Fenton Property.  All such actions were in violation of the Loan Documents.

21.    Only weeks after signing the CMA and while it was in the process of being implemented, Park West again defaulted on the Fenton Loan obligations by, among other things, failing to make a $450,000 payment to the "Operating Expense Reserve" established under the CMA.  By April 1, 2010, Park West again faced the maturing of the Fenton Loan and all amounts coming due.  Instead of making and additional principal payment to obtain an automatic one-year extension, however, Park West elected to cause further defaults under the Loan Documents.

22.    Nevertheless, Park West requested that HCMLP refrain from foreclosing on the Fenton Property and provide Park West with an opportunity to cure the default and extend the term of the Fenton Loan.  HCMLP required Park West to make a principal reduction payment before agreeing to extend the Fenton Loan yet another time, but Park West again indicated that it was unable to make such payment.  In an effort to resolve the dispute, HCMLP agreed to modify the CMA to provide for monthly principal reduction payments in lieu of requiring a lump sum payment to extend the term of the Fenton Loan. As a result, the parties modified the Fenton Loan Documents for a third time, effective April 1, 2010, (the "Third Fenton Loan Modification").  A true copy of the Third Fenton Loan Modification is attached as **Exhibit K**.  In connection with the Third Fenton Loan Modification, Park West agreed, among other things, to extend the maturity date to April

13

1, 2012, and to enter into an amended and restated CMA (the "Amended CMA"). A true

copy of the Amended CMA is attached as **Exhibit L**.

23.    As before, however, Park West continued to breach the Loan Documents

and engaged in underhanded conduct to the detriment of the Fenton Lenders.

Unbeknownst to HCMLP, NexBank and the Fenton Lenders, for example, the Debtor's

agents imposed a tax lien on the additional collateral obtained pursuant to the First

Fenton Loan Modification in May 2010.  As HCMLP discovered only days before a

mediation with the Debtor in October 2010, Park West and its agents, also sent a letter to

the tenants of the Fenton Property falsely advising that the Lockbox Account had been

cancelled and all payments should be sent to Park West's agent, Regis Property

Management, LLC (an insider/affiliate).   As a direct result of the Debtor's fraudulent

letter, HCMLP and the Fenton Lenders have been deprived of substantial tenant

payments for the last several months.

### C.    State Court Foreclosure – Fenton Property

24.    In light of  Park West's persistent breaches and continued monetary

defaults under the Loan Documents, HCMLP accelerated the entire indebtedness owed

by Park West by letter dated October 6, 2010.  HCMLP also provided notice of January

4, 2011 foreclosure sales of the Fenton Property, the Transcontinental Property, and the

Income Realty Property.  However, due to the Debtor's eleventh-hour bankruptcy filing,

HCMLP was unable to proceed with the foreclosure sales.

25.    In addition, on December 7, 2010, HCMLP filed an action in the District

Court of Dallas County, Cause No. DC-10-15755-F (the "State Court Action"), against

Park West, Transcontinental and various insiders/affiliates for breach of contract, fraud,

tortuous interference and related claims.  A detailed description of Park West's defaults,

14

misappropriation of rents and other wrongful actions is set forth in HCMLP's Original

Petition in the State Court Action, attached hereto as **Exhibit M**[13].

26.     Park West failed to take any necessary steps to address its defaults and the

substantial indebtedness due to the Fenton Lenders pursuant to the terms of the Fenton

Loan Documents.  As of January 18, 2011, the Fenton Lenders are owed no less than

**$60,056,946.99** (exclusive of legal fees, costs, expenses and other items) pursuant to the

terms of the Fenton Loan Documents.

> **D.     Multiple Entities Attempt to *Roll-up* Collateral of Multiple Lenders Into One Entity**

27.     Prior to January 4, 2011 (the date set for the foreclosure sales of the

Fenton Property, the Transcontinental Property, and the Income Realty Property[14]), Park

West developed a last minute scheme to change its name twice and merge various assets

and entities before filing its Chapter 11 petition.  The fact that the Debtor did not file any

first day motions, including, and probably most important, to use cash collateral of the

few income producing properties (including the Fenton Property) until 10 days after the

filing of the Petition[15], further demonstrates that Park West's last minute *maneuvering* of

assets and entities was not well planned and implemented in advance of its Chapter 11

filing.

---

[13]     As noted in Footnote 8, *infra*, HCMLP has provided the Debtor and its insiders/affiliates multiple opportunities to comply with the terms of the Fenton Loan Documents.  The historical recitation of facts within the Original Petition filed in the State Court Action is replete with contractual breaches and misuse of the Fenton Lender's collateral demonstrating a pattern of intentional delays and actions designed to hinder the Fenton Lenders from realizing on their collateral, all culminating in the final delay, the filing of this Case.

[14]     January 4, 2011, was also the foreclosure sale date for multiple other properties.  See, Footnote 5, *supra*.

[15]     The Debtor's Petition was filed on January 4, 2011, and the first pleadings of substance filed by the Debtor were filed on January 14, 2011.

76332/0022-7348570v1

28.    On December 23, 2010, Park West changed its name to Fenton Real Estate, Inc.  On December 30, 2010, Fenton Real Estate, Inc. changed its name to FRE Real Estate, Inc., the Debtor that filed this Case.  True copies of Park West's Certificates regarding its two name changes are collectively attached as **Exhibit N**.

29.    After twice changing its name, the Debtor's insiders/affiliates caused at least 18 other entities (many of which are believed to be single asset real estate entities and entities controlled by insiders/affiliates of the Debtor) to transfer and/or merge their respective properties (38 in aggregate) into the Debtor.  The Summary Schedule (Exhibit A hereto) addresses the following transactions in greater detail:

- **TRANSFERORS**:  The following 19 insider/affiliate entities transferred the following 38 properties to the Debtor on the eve of the Petition:

  - <u>Income Opportunity Realty Investors, Inc.</u>
    - Three Hickory - 6.6 undeveloped acres [Exhibit A, Line 2]

  - <u>American Realty Trust, Inc.</u>
    - Valwood/Mercer Crossing - 257.05 undeveloped acres [Exhibit A, Line 14]

  - <u>TCI 109 Beltline, Inc.</u>
    - Payne-North - 109.85 undeveloped acres [Exhibit A, Line 16]

  - <u>ART Collection, Inc.</u>
    - Pioneer Crossing – 97.28 undeveloped acres [Exhibit A, Line 17]

  - <u>TCI McKinney Ranch, Inc.</u>
    - McKinney Ranch – 20.8445 undeveloped acres [Exhibit A, Line 18]

  - <u>Coventry Pointe, Inc.</u>
    - Archon – 29.446 undeveloped acres [Exhibit A, Line 19]

  - <u>TCI Amoco Property, LLC</u>
    - Amoco Building – New Orleans, LA [Exhibit A, Line 20]

  - <u>Transcontinental Westgrove, Inc.</u>
    - Parkway North Office Building [Exhibit A, Line 21]

  - <u>Westgrove Air Plaza, Ltd.</u>
    - Westgrove Air Plaza – building/ground lease [Exhibit A, Line 33]

16

- **TCI Hunters Glen, Inc.**
  - Bridgewood Ranch Apartments – 106 units [Exhibit A, Line 25]

- **IORI Centura, Inc.**
  - Centura - 10.08 undeveloped acres [Exhibit A, Line 26]

- **TCI Bridgewood, LLC**
  - Bridgewood Ranch - 5.0407 undeveloped acres [Exhibit A, Line 34]

- **TCI Adams, LLC**
  - Kaufman Adams - 193.731 undeveloped acres [Exhibit A, Line 35]

- **TCI Pantaze, LLC**
  - Pantaze - 5.997 undeveloped acres [Exhibit A, Line 36]

- **TCI Ridgepoint, LLC**
  - Ridgepoint Drive - .65 undeveloped acres [Exhibit A, Line 38]

- **ART Palm, LLC**
  - Senlac/Valley View - 3.976 undeveloped acres [Exhibit A, Line 39]

- **Thornwood Land and Cattle, LLC**
  - Limestone Canyon II - 9.961 undeveloped acres [Exhibit A, Line 24]
  - Temple Land - 10.692  undeveloped acres [Exhibit A, Line 23]
  - Teleport Blvd. - vacant building & 3.7404 undeveloped acres [Exhibit A, Line 22]

- **Transcontinental Realty Investors, Inc.**
  - Thermalloy Building (vacant) [Exhibit A, Line 3]
  - Kinwest Tract - 27.11 undeveloped acres [Exhibit A, Line 15]
  - Ackerley - 1.31 undeveloped acres [Exhibit A, Line 37]
  - Hollywood Casino/Mira Lago - 18.56 undeveloped acres [Exhibit A, Line 27]
  - Wilmer 88 - 87.6249 undeveloped acres [Exhibit A, Line 28]
  - Dominion - 10.59 undeveloped acres [Exhibit A, Line 29]
  - Stanley Tools - 23.76 acres [Exhibit A, Line 30]
  - Crowley - 24.91 undeveloped acres [Exhibit A, Line 31]
  - Creekside - 20.071 undeveloped acres [Exhibit A, Line 32]

- **TCI Texas Properties, LLC**
  - Kaufman 30 - 30.997 undeveloped acres [Exhibit A, Line 4]
  - Kaufman 35 - 34.82 undeveloped acres [Exhibit A, Line 5]
  - Kaufman 2700 - 2564.11 undeveloped acres [Exhibit A, Line 6]
  - Valley Ranch - 12.3488 undeveloped acres [Exhibit A, Line 7]
  - Valley Ranch - 14.5641 undeveloped acres [Exhibit A, Line 8]
  - Payne South - 39.87 undeveloped acres [Exhibit A, Line 9]
  - Diplomat II (3.7) - 3.7021 undeveloped acres [Exhibit A, Line 10]
  - Diplomat I (3.9) - 3.9028 undeveloped acres [Exhibit A, Line 11]
  - Diplomat II (4) - 4.0489 undeveloped acres [Exhibit A, Line 12]
  - Senlac Hutton - 2.4220 undeveloped acres [Exhibit A, Line 13]

17

- **LENDERS**:  The following 11 secured lenders are affected by the actions of their respective borrower as a result of the transfers of collateral to the Debtor:

  - HCMLP
  - Wells Fargo Capital Finance, Inc.
  - Armed Forces Bank, N.A.
  - State Bank of Texas
  - Petra CRE CDO 2007-1, Ltd.
  - U.S. Bank, National Association
  - American Bank of Commerce
  - The Bank of Weatherford and First Bank & Trust
  - RMR Investments, Inc.
  - Regions Bank
  - Access 1st Capital

- **PROPERTIES**:   The Debtor summaries the properties owned by and transferred into the Debtor as follows[16]:

  - The Debtor owns, leases and/or operates approximately 38 parcels of real property located in Texas and Louisiana
  - The Debtor has 29 parcels of raw land
  - The Debtor has 6 operating office buildings
  - The Debtor has 1 apartment complex
  - The Debtor has 2 airplane hanger
  - All of the Debtor's real property, save for the Fenton Property, was acquired December 23, 2010, twelve days prior to the Petition Date
  - Only the Fenton Property, the Amoco Building, the Parkway North Property, the Westgrove Air Plaza and the Addison Hanger I are projected to produce cash flow during the first 3 months of the Case

30.    It is also important to recognize the structure and components of the transfers of property to the Debtor that occurred on December 23, 2010.  By way of example, the transactions in connection with the property commonly known as *Centura* (consisting of 10.08 acres of undeveloped land – Exhibit A, Line 26) which was owned

---

[16]        *See,* Debtor *Emergency Motion for Interim and Final Orders Authorizing the Debtor to use Cash Collateral, etc.* [Docket number 52], and the Exhibits presented in support thereof at the Interim hearing held on January 20, 2011.

18

prior to December 23, 2010, by IORI Centura, Inc., (the "Centura Property") are detailed

as follows[17]:

- A Purchase Agreement was entered into by and between IORI Centura, Inc. (as Seller) and Fenton Real Estate, Inc. (the Debtor, as Buyer), with respect to the Centura Property. The Purchase Price was arbitrarily set by the Debtor and its insiders/affiliates at $13 Million. A true copy of the Purchase Agreement is attached as **Exhibit O;**

- The Purchase Price consisted of the assumption of: (a) "the existing mortgage debt and property tax obligations encumbering" the Centura Property of approximately $7.2 Million; and (b) "the Seller's trade debt for the Property" (in an unspecified amount)[18]. See, Exhibit O, paragraph 1.3;

- The balance of the Purchase Price is to be paid by the Debtor and evidenced by a promissory note in the amount of approximately $5.7 Million, bearing interest at 6% per annum, all due and payable (accrued interest and principal) in 5 years[19]. See, Exhibit O, paragraph 1.3. A true copy of the promissory note is attached as **Exhibit P;**

- Each of the Debtor and the Seller (IORI Centura, Inc.) execute Certified Resolutions with respect to the purchase and sale of the Centura Property.

---

[17]     The transactions with respect to the Centura Property are indicative and illustrative of the transactions that occurred with many of the properties transferred to the Debtor prior to the Petition Date. See, also, Footnote 16, *supra*. The Debtor has produced documents evidencing, *inter alia*: (a) the assignment of the promissory note issued by the Debtor to TCI Adams, LLC (See, Exhibit A, Line 35) to Transcontinental Realty Investors, Inc.; (b) the assignment of the promissory note issued by the Debtor to TCI Pantaze, LLC (See, Exhibit A, Line 36) to Transcontinental Realty Investors, Inc.; (c) the assignment of the promissory note issued by the Debtor to TCI Bridgewood, LLC (See, Exhibit A, Line 34) to Transcontinental Realty Investors, Inc.; (d) the assignment of the promissory note issued by the Debtor to TCI Hunters Glen, Inc. (See, Exhibit A, Line 25) to Transcontinental Realty Investors, Inc.; (e) the assignment of the promissory note issued by the Debtor to Coventry Pointe, Inc. (See, Exhibit A, Line 19) to Transcontinental Realty Investors, Inc.; and (f) the assignment of the promissory note issued by the Debtor to TCI Amoco Property, LLC (See, Exhibit A, Line 20) to Continental Poydras Corp.

[18]     While the Purchase Agreement specifically uses the phrase "Seller's trade debt for the Property" it is believed that what is actually intended by the Debtor and its insiders/affiliates is the Debtor's assumption of all unsecured obligations of the Seller, IORI Centura, Inc.

[19]     The collective insiders/affiliates established a *value* for the Centura Property (or as the Debtor has stated the "equity that existed over and above the debt service" – See, Debtor *Emergency Motion for Interim and Final Orders Authorizing the Debtor to use Cash Collateral, etc.* [Docket number 52], at paragraph 8, page 3), for the *Centura* property. The promissory note was thus calculated to equal the difference between the established *value* and the secured debt owed – likely in an attempt to avoid the appearance of *striping* the transferor (IORI Centura, Inc.) of the equity in the transferred property.

19

A true copy of the Certified Resolutions are attached as **Exhibits Q and R,** respectively;

● IORI Centura, Inc. executes and records a General Warranty Deed transferring title to the Centura Property to the Debtor. A true copy of the General Warranty Deed is attached as **Exhibit S**;

● IORI Centura, Inc. (Subsidiary) enters into a Distribution Agreement with its direct parent entity, IORI Operating, Inc. (Parent) with respect to the promissory note, in the approximate amount of $5.7 Million, made and issued by the Debtor to IORI Centura, Inc., which agreement provides for the distribution of the promissory note to the Parent entity[20]. A true copy of the Distribution Agreement is attached as **Exhibit T**;

● IORI Centura, Inc. executes an Allonge with respect to the approximate $5.7 Million promissory note made and issued by the Debtor, with the notation "Pay to the order of IORI Operating, Inc., a Nevada corporation, without recourse." A true copy of the Allonge is attached as **Exhibit U**; and

● Each of IORI Centura, Inc. (Subsidiary) and IORI Operating, Inc. (Parent) execute Certified Resolutions with respect to the Distribution Agreement. A true copy of the Certified Resolutions are attached as **Exhibits V and W,** respectively.

31.   As a further act of bad faith, the Debtor and its insiders/affiliates have intentionally harmed multiple unsecured creditors holding claims in excess of $1.4 Million[21]. The series of transactions that culminated in assigning the promissory note, issue by the Debtor to the transferor of the real property, to the parent entity of the transferor, directly and intentionally damaged unsecured creditors of the transferor entity.

---

[20]      Notwithstanding the issuance of the note for the artificially created equity in the *Centura* property owned by IORI Centura, Inc. the note was immediately *up-streamed* to another insider/affiliate, IORI Operating, Inc., thus *striping* the creditors of IORI Centura, Inc., of any equity that may have existed. This striping concept is address further in Paragraph 28, *infra*.

[21]      The Debtor has provided HCMLP, and others, with a schedule of unsecured debt owed by the various insider/affiliate transferors, which debt existed prior to the transfers of property to the Debtor, and is alleged to have been assumed by the Debtor. A true copy of the Debtor's schedule of unsecured debt is attached as **Exhibit X**. HCMLP does not acknowledge or suggest that Exhibit X is accurate or complete.

The damage can be easily recognized by further analyzing the series of transactions outline in the preceding paragraph.

- Prior to IORI Centura, Inc. (the insider/affiliate transferor of the real property) transferring the Centura Property to the Debtor, IORI Centura, Inc. owed both (a) the debt secured by the Centura Property to The Bank of Weatherford and First Bank & Trust (See, Exhibit A, Line 26), and (b) its own unsecured creditors[22];

- In exchange for transferring the Centura Property to the Debtor, the Debtor assumed both the secured and unsecured debt owed by IORI Centura, Inc.[23]

- The Debtor issued a promissory note to IORI Centura, Inc. in exchange for the artificially determined equity in the Centura Property. Thus, even assuming there was equity in the Centura Property that existed prior to the transfer of the Centura Property to the Debtor, which equity could be used to protect the interests of IORI Centura, Inc.'s unsecured creditors such equity was removed from the Debtor by the issuance of the promissory note;

- Even if IORI Centura, Inc.'s unsecured creditors could continue to look to IORI Centura, Inc. for payment of the unsecured debt, the promissory note from the Debtor was immediately transferred out of IORI Centura, Inc. to its parent entity, IORI Operating, Inc., thus further striping IORI Centura, Inc. of its assets, to the detriment of its unsecured creditors;

- The effect of (a) issuing the promissory note from the Debtor to IORI Centura, Inc., and, then (b) transferring the promissory note from IORI Centura, Inc. to IORI Operating, Inc., was to eliminate any prospects of value or equity in excess of the secured debt constituting a lien against the Centura Property (at both the Debtor level and the IORI Centura, Inc., level), for the benefit of unsecured creditors of IORI Centura, Inc.; and

- After the assignment of Debtor issued promissory note from IORI Centura, Inc., to its parent entity, IORI Operating, Inc., the equity interest in IORI Centura, Inc. was sold by IORI Operating, Inc., to ABCLD

---

[22]    Exhibit X demonstrates that IORI Centura, Inc. owed, *inter alia*, $1,783.23 to Geary, Porter & Donovan, PC.

[23]    There is no evidence that any of the secured lenders or unsecured creditors consented to any assumption of liability by the Debtor, nor the release of the true obligor of debt.

Income, LLC (another insider/affiliate[24]) for nominal consideration ($1,000). [25]

32.     The foregoing summaries of transactions and events leads to one simple conclusion - - the Debtor and its insiders/affiliates have invented a structure to frustrate multiple secured lenders and general unsecured creditors from legally protecting their respective rights pursuant to contractual agreements.

## IV.     RELIEF REQUESTED

33.     The Debtor's estate is essentially a grouping of single asset real estate entities and their respective properties.  In an effort to delay foreclosure sales and to circumvent the restrictions the Bankruptcy Code places on SARE cases, the Debtor and its insiders/affiliates orchestrated the transfers of the properties owned by multiple insiders and/or affiliated entities, many of which entities are believed to be special purpose real estate entities.[26]

---

[24]     ABCLD Properties, LLC is the sole shareholder of the Debtor.  However, from the documents provided by the Debtor it is clear that the notes issued by the Debtor are currently held by ABCLD Income, LLC.  Further, Pursuant to the Debtor's *Application for Order Authorizing Employment of Neligan Foley, LLP, etc.* [Docket number 41] ABCLD Properties, LLC is directly or indirectly owned by Ronald F. Akin and F. Terry Shumate.  Mr. Akin is the President and a Director of the Debtor, and holds (indirectly) 50% of the Debtor's equity.  Mr. Shumate is a Vice President, the Treasurer, the Secretary and a Director of the Debtor, and holds (indirectly) 25% of the Debtor's equity.  Messrs. Akin and Shumate are the sole Directors of the Debtor.  See, also, Debtor's Statement of Financial Affairs, Question number 21 [Docket number 106].

[25]     The subsequent transfers of the equity holdings in: (a) TCI Amoco Property, LLC, held by Continental Poydras Corp., (b) Coventry Pointe, Inc. held by Transcontinental Realty Investors, Inc.; (c) TCI Bridgewood, LLC held by Transcontinental Realty Investors, Inc.; (d) TCI Adams, LLC held by Transcontinental Realty Investors, Inc.; (e) TCI Pantaze, LLC held by Transcontinental Realty Investors, Inc.; and (f) Transcontinental Westgrove, Inc. held by Transcontinental Realty Investors, Inc. were all sold to ABCLD Income, LLC for nominal consideration ($1,000).

[26]     11 U.S.C. §101(51B) provides that a "single asset real estate" is defined as: real property constituting a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the gross income of a debtor who is not a family farmer and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental.

34.     The transfers with respect to some of the collateral[27] of the Fenton Lenders violates the express terms of Article 12 of the Fenton Loan Agreement (Exhibit D, hereto) and demonstrates the Debtor's bad faith and intent to manipulate the process, the rights and remedies afforded to the Fenton Lenders as well as the Bankruptcy Code, by all means available.[28]  As noted by other secured lenders, the transfer of property from the borrower to the Debtor violated the express terms of loan documents and agreements as among such other secured lenders and borrowers, as it did with respect to the Fenton Loan Documents.[29]

35.     The Debtor's efforts to convert a straightforward foreclosure action/two-party bankruptcy case into a multi-lender, multi-collateral Chapter 11 case should not be sanctioned by the Court, but rather must be rejected.  Through this Motion, HCMLP seeks an order from the Court terminating the Debtor's exclusivity period pursuant to section 1121 (d) of the Bankruptcy Code and allowing HCMLP to proceed with the filing of a disclosure statement and Chapter 11 plan for the Debtor.

---

[27]     As noted in the Summary Schedule (Exhibit A hereto), the Fenton Property was owned by the Debtor and not part of the *roll-up* structure created by the Debtor and its insiders/affiliates.  In contrast, the Realty Investors Property and the Transcontinental Property, both of which are also collateral of the Fenton Lenders, were owned, prior to December 23, 2010, by entities other than the Debtor and were transferred to the Debtor as part of the *roll-up*.

[28]     Specifically, Section 362(d)(3) of the Bankruptcy Code effectively shortens the time periods set forth under section 1121 of the Bankruptcy Code for SARE debtors.  The Bankruptcy Court will grant relief from the automatic stay to a secured creditor unless the SARE debtor:(i) files a reorganization plan within the later of: (A) 90 days after the commencement of the bankruptcy case (or such date determined by the court for cause by an order entered during the first 90 days of the case); or (B) 30 days after the court determines the debtor is subject to SARE requirements; or (ii) commences monthly interest payments to the secured creditor at the applicable non-default contract rate of interest.  In an obvious attempt to avoid the restrictions placed on a SARE debtor, TCI made bad faith transfers of the mortgaged properties.  This and related conduct gives rise to HCMLP's motion to terminate the Debtor's exclusivity.

[29]     See, *Motion of State Bank of Texas Seeking to Annul or, Alternatively, Seeking Relief From, the Automatic Stay, etc.* [Docket number 56], at paragraph 7; and Well Fargo Capital Finance, Inc.'s *Motion to Dismiss FRE Real Estate, Inc.'s Chapter 11 Petition, etc.* [Docket number 23], at paragraphs 9 and 15.

36.     Pursuant to section 1121(d) of the Bankruptcy Code, "[o]n request of a party in interest made within the respective periods specified in subsections (b) and (c) of this section and after notice and a hearing, the court may for cause reduce or increase the 120-day period or the 180-day period referred to in this section." 11 U.S.C. §1121(d).

37.     Section 1121(d) grants great latitude to the Bankruptcy Court in deciding, on a case-specific basis, whether to modify the exclusivity period on a showing of cause. In re Henry Mayo Newhall Mem'l Hosp., 282 B.R. 444, 452 (9th Cir. BAP 2002) ("[T]he question is inherently fact-specific and calls for a delicate exercise of judgment."); Geriatrics Nursing Home v. First Fid. Bank, N.A., 187 B.R. 128 (D.N.J. 1995). "Section 1121 was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostage of Chapter 11 debtors." In re Timbers of Inwood Forest Assocs., Ltd., 808 F.2d 363, 372 (5th Cir. 1987). In determining whether cause exists to support termination of exclusivity, courts generally consider multiple factors.[30] Relevant to the inquiry of termination here are: (i) the size and complexity of the case; (ii) debtor's progress toward reorganization; and (iii) reasonable prospects for filing a viable plan.[31]

---

[30]     The non-exclusive factors include: (a) the size and complexity of the case; (b) the necessity of sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information to allow a creditor to determine whether to accept such plan; (c) the existence of good faith progress towards a reorganization; (d) the fact the debtor is paying its bills as they become due; (e) whether the debtor has demonstrated reasonable prospects for filing a viable plan; (f) whether the debtor has made progress in negotiations with its creditors; (g) the amount of time which has elapsed in the case; (h) whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands; and (i) whether an unresolved contingency exists. See In re Henry Mayo Newhall Mem'l Hosp., 282 B.R. at 452; In re Trans Max Techs., Inc., 349 B.R. 80, 92 (Bankr. D. Nev. 2006); In re Dow Corning Corp., 208 B.R. 661, 664-65 (Bankr. E.D. Mich. 1997); In re Adelphia Commc'ns Corp., 352 B.R. 578 (Bankr. S.D.N.Y. 2006); In re Express One Int'l, Inc., 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996).

[31]     A primary consideration in determining whether to terminate a debtor's exclusivity centers on whether the debtor has demonstrated a reasonable prospect for filing a confirmable plan of reorganization. See In re Henry Mayo Newhall Mem'l Hosp., 282 B.R. at 452; In re Gen. Bearing Corp., 136 B.R. 361, 367 (Bankr. S.D.N.Y. 1992) (denying debtor's request to extend exclusivity where debtor was unable to propose a confirmable plan and further delay would not enhance its prospects); In re Grossinger's Assocs., 116 B.R. 34, 35-36 (Bankr. S.D.N.Y. 1990) (terminating exclusivity where debtor proposed a manifestly

All told, application of these factors overwhelmingly supports termination of exclusivity in this Case.

38.     Specifically, the size and complexity of the case has been engineered by Park West and its insiders/affiliates.  Park West took what was a straightforward two-party, single asset dispute and created a multi-lender, multi-collateral mess.  It is beyond question that the complexity of the Case as manufactured by Park West, weighs in favor of the termination of the Debtor's exclusivity period.

39.     As to the Debtor's progress towards reorganization and prospects for filing a viable plan, the Court need not waste any time providing this Debtor with additional time to demonstrate its inability.

40.     By the Debtor's own admission, the Debtor does not have unencumbered cash flow.  The Debtor's *Emergency Motion for Interim and Final Orders Authorizing the Debtor to use Cash Collateral, etc.* [Docket number 52], clearly acknowledges a need to use the cash flow from the few income producing properties (including the Fenton Property) to support the majority of the other properties, which are not income producing.  Paragraph 13, page 5, of the motion provides:

> *For the Debtor's properties that constitute raw land, the Debtor will require approximately $20,000 per month, of which $9,000 is for tax escrows, in order to maintain those properties during this bankruptcy. Therefore, the Debtor seeks to use cash flow from the operating properties to maintain the raw land and escrow the necessary taxes on the raw land.*

41.     Moreover, the Debtor has no right to use any of the rents from the Fenton Property to pay any expenses or make any adequate protection payments.  Park West

---

unconfirmable plan); In re Mid-State Raceway, Inc., 323 B.R. 63, 69 (Bankr. N.D.N.Y. 2005) (refusing to extend exclusivity upon the court's finding that "further delay in the confirmation process resulting from extension of debtor's exclusivity period could well damage the prospects of realizing the intrinsic economic value of debtor's business").

76332/0022-7348570v1

absolutely and unconditionally assigned all of the rents from the Fenton Property to the Lenders.[32]  (See, Deed of Trust, Exhibit E, p. 30.)  The Debtor, therefore is not entitled to use the rents from the Fenton Property as cash collateral pursuant to controlling case law. See Federal Deposit Insurance Corp. v. International Property Management, Inc., 929, F.2d 1033, 1035-36 (5th Cir. 1991) (holding that absolute assignment of rents clause in the deed on trust passed immediate title to rents to the secured lender, subject to postponement of enjoyment of rent proceeds until the mortgagor defaults); In re Four Bucks, LLC, 2009 WL 1857432 (Bankr. N.D. Tex. 2009) (holding that where the debtor absolutely assigned the rents to the secured creditor, no interest in the rents passed to the debtor's estate and the debtor could not properly use the rents as cash collateral). Because the Debtor absolutely assigned the rents to the Fenton Lenders and is unable to use the rents for any purpose, including cash collateral or adequate protection payments, the Debtor has no ability to confirm a plan or reorganization[33].

42.    A plan is not reasonably likely to succeed for purposes of Bankruptcy Code section 1129(a)(11) unless the debtor can offer more than mere speculation regarding the source of funding.  See, In re Trans Max Techs., Inc., 349 B.R. 80, 93 (Bankr. D. Nev. 2006) ("The court cannot reasonably rely on Trans Max's mere belief of new money coming into its operations after plan confirmation on the basis of only having

---

[32]    Section 10.1 (Assignment of Rents and Leases) of the Fenton Deed of Trust specifically provides that "all of the Rents are hereby absolutely and unconditionally assigned to Beneficiary, to be applied by Beneficiary in payment of the Indebtedness."  It further provides that "the assignment in this Paragraph 10.1 is an absolute assignment and not merely a security interest."  See Deed of Trust, Exhibit E., p. 30.

[33]    The *Interim Order Authorizing the Debtor to use Cash From Fenton Center Property and for Related Relief* [Docket number 93], specifically acknowledges, at page 2, that HCMLP asserts that the
    *... rents, profits, and proceeds (the "Fenton Center Cash") from the real property securing the HCMLP Lenders' secured claim (the "HCMLP Collateral") were absolutely and unconditionally assigned to the HCMLP Lenders before January 4, 20111 (the "Petition Date") and are not property of FRE's estate (all of which assertions are not agreed with by the Debtor); ... .*
Thus, HCMLP has preserved various issues, including, whether the cash flow from the Fenton Property is cash collateral.

preliminary negotiations."); In re Save Our Springs (S.O.S.) Alliance, Inc., 388 B.R. 202,

245 (Bankr. W.D. Tex. 2008) ("'Without evidence of a firm commitment of financing, a

Plan does not meet the feasibility requirement.'") (citations omitted).  To this end, the

Debtor must provide evidence of a firm commitment of financing or other concrete

evidence of funding.    See, e.g., In re Trans Max Techs., Inc., 349 B.R. at 92

("Particularly important in this regard is that the plan proponent demonstrate that any

necessary financing or funding has been obtained, or is likely to be obtained."); In re B-

PVL1, LLC, 2010 WL 4853299, at *3 (Bankr. D. Nev. Jan. 22, 2010); In re Made in

Detroit, Inc., 299 B.R. 170, 176 -77 (Bankr. E.D. Mich. 2003); In re Walker, 165 B.R.

994, 1005 (E.D. Va. 1994); In re Ralph C. Tyler, P.E., P.S., Inc., 156 B.R. 995, 997

(Bankr. N.D. Ohio 1993); In re Stratford Assocs. Ltd. P'ship, 145 B.R. 689, 699 (Bankr.

D. Kan. 1992); In re Hoffman, 52 B.R. 212, 215 (Bankr. D.N.D. 1985).

43.    Here, the Debtor has not filed any substantive pleading with the Court

shedding light on how it intends to operate and meet its fiduciary obligations, much less

confirm a plan.    Any "plan" that the Debtor may proffer would be, at best, an

unsubstantiated and unrealistic reorganization strategy.    Rather, the Debtor filed its

petition solely for the purpose of staying the multiple foreclosure sales scheduled for

January 4, 2011.

44.    Potential and unsubstantiated and unrealistic reorganization strategies

should not delay a termination of exclusivity as a debtor must demonstrate "a reasonable

possibility of a successful reorganization within a reasonable time."    In re Timbers of

Inwood Forest Assocs., Ltd., 808 F.2d at 370-71; In re Sun Valley Newspapers, Inc., 171

B.R. 71, 75 (9th Cir. BAP 1994).  To meet this heavy burden, a debtor must prove that the

76332/0022-7348570v1

proposed plan is **not patently unconfirmable** and that, **in the near future**, it has a realistic chance of being confirmed. In re Sun Valley Newspapers, Inc., 171 B.R. at 75; In re 266 Washington Assocs., 141 B.R. 275, 281 (Bankr. E.D.N.Y. 1992); In re Ashgrove Apts. of DeKalb County, Ltd., 121 B.R. 752, 756 (Bankr. S.D. Ohio 1990); In re Marston Enter., Inc., 13 B.R. 514, 515 (Bankr. E.D.N.Y. 1981). The Debtor undoubtedly has no realistic chance of confirming a viable reorganization plan that addresses the substantial indebtedness owed to HCMLP and the other secured lenders.

45.    Considering that the Debtor lacks the financial wherewithal to prosecute a reasonably confirmable reorganization plan, additional time also will not enhance the Debtor's prospects of retaining ownership of the Property. See In re Henry Mayo Newhall Mem'l Hosp., 282 B.R. at 452; In re Dow Corning Company, 208 B.R. at 670 (holding that "when the court is determining whether to terminate exclusivity, a primary consideration should be whether or not doing so would facilitate moving the case forward"); In re Pub. Serv. Co. of N.H., 99 B.R. 155, 173 (Bankr. D.N.H. 1989) (holding that "continuation of a Debtor's exclusivity must be paid for by hard bargaining . . . in formulating and gaining acceptance of a plan of reorganization").

46.    In light of the timing of the filing and the bad faith actions of Park West and its insiders/affiliates to transfer the mortgage properties to the Debtor in violation of the terms of the Fenton Loan Agreement and others, it is clear that the Debtor has no realistic ability to confirm a plan of reorganization since it has no unencumbered assets of the estate with which the Debtor could hope to adequately protect HCMLP's interest in the Debtor's assets.

76332/0022-7348570v1

47.     To the contrary, the Draft Plan affords all protections to all parties including the Fenton Lenders, other secured creditors, unsecured creditors and the Debtor by providing a forum to sell each of the properties to the highest bidder, subject to bidding procedures approved by this Court.  More specifically, each secured creditor is separately classified, as required by the Bankruptcy Code, unsecured creditors are afforded claims against, initially, the equity, to the extent there is any, from the sale of the property originally owned by such creditors' debtor, and secondly against the Debtor, and finally, the equity holders retain whatever, they had on the Petition Date.

48.     Accordingly, HCMLP respectfully requests that the Court grant its motion to terminate the Debtor's exclusivity period.


DATED: February 2, 2011      Cole, Schotz, Meisel, Forman & Leonard, P.A.


By:    /s/ Michael D. Warner
        Michael D. Warner, Esq.
        Leo V. Leyva, Esq.
        301 Commerce Street
        Suite 1700
        Fort Worth, Texas  76102
        817-810-5250
        817-810-5255  Facsimile

        Attorneys for Highland Capital Management, L.P.

76332/0022-7348570v1

## CERTIFICATE OF CONFERENCE

The undersigned hereby certified that, on February 1, 2011, prior to the filing of this Motion, I, as counsel to HCMLP, spoke to Doug Buncher, the Debtor's counsel, and explained to him the nature of the relief sought by HCMLP in this Motion.  Counsel for the Debtor would not consent to the relief sought herein.  Further, given that fact that other secured creditors are impacted by the Debtor's wrongful actions, it is likely that this matter will be litigated, and no resolution short of litigation will occur.

/s/ Michael D. Warner
Michael D. Warner

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served upon all parties on the attached Master Service List by pre-paid postage U.S.P.S First Class Mail and/or the Court's ECF System in the above case on this 2nd day of February, 2011.

/s/ Michael D. Warner
Michael D. Warner

30